E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture & Recovery Section
DAN G. BOYLE (Cal. Bar No. 332518)
TARA B. VAVERE (Cal. Bar No. 279470)
Assistant United States Attorneys
Asset Forfeiture & Recovery Section
Federal Courthouse, 14th Floor
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2426/5901
     Facsimile: (213) 894-0142
     E-mail: Daniel.Boyle2@usdoj.gov
             Tara.Vavere@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:18-cv-670-PVC |
| Plaintiff, | PLAINTIFF'S PROPOSED FINDINGS OF FACT |
| v. | |
| $148,145.00 IN U.S. CURRENCY, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Dan G. Boyle and Tara B. Vavere, hereby files its Proposed Findings of Fact following trial in this matter.

| PROPOSED FACTS | TRIAL EVIDENCE |
|---|---|
| **The Seizure of the Defendant Currency** ||
| 1. The defendant in this case is $148,145.00 in United States currency (the "Defendant Currency"). | • ECF 159-1, at ¶8 (Parties' Stipulated Facts) |
| 2. On July 25, 2017, Daniel Flint presented himself to Chicago's Midway International Airport TSA for passenger screening intending to fly through Minneapolis-St. Paul Airport en route to LAX. | • ECF 159-1, at ¶ 1 (Parties' Stipulated Facts) |
| 3. TSA officials allowed Flint to travel without submitting his baggage to TSA screening. | • ECF 159-1, at ¶ 2 (Parties' Stipulated Facts)<br>• TR 1 at 27:6-17 |
| 4. While Flint was en route to LAX, TSA officials contacted the Federal Bureau of Investigation ("FBI") and devised a plan to conduct a "reverse screening" on Flint upon his arrival at LAX. | • ECF 159-1, at ¶ 3 (Parties' Stipulated Facts)<br>• TR 1 at 27:18-25 |
| 5. Upon Flint's arrival at LAX, TSA initiated the "reverse screening," including an interview with FBI agents and other federal law enforcement. | • ECF 159-1, at ¶ 4 (Parties' Stipulated Facts);<br>• TR 1 at 27:3-5<br>• TR 1 at 29:1-21<br>• TR 1 at 94:18-25 |
| 6. The agents asked to search Flint's bags, including what was labeled a "diplomatic pouch" (the "Pouch"), but Flint did not allow a search at that point. | • ECF 159-1, at ¶ 5 (Parties' Stipulated Facts)<br>• TR 1 at 30:7-25, 31:1-17<br>• TR 1 at 48:1-15 |

2

| **PROPOSED FACTS** | **TRIAL EVIDENCE** |
|---|---|
| 7. The Pouch was zippered, locked, and embroidered with the words "Diplomatic Pouch" | • GEX 1, at 3-5<br>• TR 1 at 30:22-25, 31:9-20 |
| 8. The Pouch had a plastic card insert window with a card inserted stating "International Human Rights Commission (IHRC) Diplomatic Pouch" | • GEX 1, at 3-5<br>• TR 1 at 31:9-20 |
| 9. Flint stated to the interviewing agents that he was a diplomatic courier. | • TR 1 at 75:15-25 |
| 10. Flint stated to the interviewing agents that Robert Shumake had appointed him as a diplomatic courier. | • TR 1 at 46:13-18 |
| 11. Flint stated to the interviewing agents that Shumake had administered an oath to him granting him diplomatic status. | • TR 1 at 47:10-15 |
| 12. Flint stated to the interviewing agents that he was traveling and carrying the Pouch that day on behalf of Shumake. | • TR 1 at 47:1-9 |
| 13. Flint stated to the interviewing agents that the Pouch was not subject to security screening because he was a diplomatic courier, and directed agents to documents in his possession as proof of this claim. | • TR 1 at 46:1-12<br>• TR 1 at 38: 7-15<br>• TR 1 at 48: 8-18 |
| 14. Flint was nervous during the interview and refused to answer multiple questions on | • TR 1 at 48:1-4<br>• TR 1 at 76:19-24<br>• TR 1 at 84:14-20 |

3

| PROPOSED FACTS | TRIAL EVIDENCE |
|---|---|
| the basis of purported attorney-client privilege. | • TR 1 at 90:4-6 |
| 15. Flint was carrying a purported diplomatic identification card, but did not have a diplomatic passport. | • GEX 5 (b)<br>• TR 1 at 42:14-20<br>• TR 1 at 45:6-19 |
| 16. Flint was carrying a letter, dated July 20, 2017, which bore Shumake's signature, and titled "Diplomatic Transportation and Direction Letter" (the "Direction Letter"). | • GEX 7<br>• TR 1 at 34:10-25,35:1-3 |
| 17. The Direction Letter stated that "A portion of these deposits shall be utilized as a down payment on real estate transactions in northern California." | • GEX 7<br>• TR 2 at 131: 13-24 |
| 18. The Direction Letter stated that "Pursuant to Articles 27.3 through 27.6 of the Vienna Convention on Diplomatic Relations (VCDR), you shall not be detained or abated in any way and the contents of your bag may not be seized or forfeited. As Designated Courier Agent of this Office, you shall be allowed to freely carryout your assignment on behalf of the International Human Rights Commission." | • GEX 7<br>• TR 1 at 37:15-25 |
| 19. The Direction Letter stated that "Although your assignment shall not be impeded in any way, please be courteous with all TSA officials and/or law | • GEX 7<br>• TR 1 at 69:2-5 |

| PROPOSED FACTS | TRIAL EVIDENCE |
|---|---|
| enforcement without violating the confidentiality of your assignment. As you are aware, this is a confidential matter and our projects and contacts are of a proprietary nature. Your assignment may not be disclosed or disseminated to anyone without the expressed written consent of this office." | |
| 20.  Flint contacted an individual by phone who identified himself as Shumake | • ECF 159-1, at ¶ 6 (Parties' Stipulated Facts)<br>• TR 1 at 50:1-11 |
| 21.  Over speakerphone, Shumake initially declined to grant consent, but ultimately gave agents consent to search the Pouch in Flint's possession without objection or dispute | • ECF 159-1, at ¶ 7 (Parties' Stipulated Facts)<br>• TR 1 at 49:19-25, 50:1-25, 51:1-19 |
| 22.  The Defendant Currency was inside the Pouch. | • ECF 159-1, at ¶ 8 (Parties' Stipulated Facts)<br>• TR 1 at 53:7-12<br>• TR 1 at 78:3-7 |
| 23.  Federal law enforcement agents seized the Defendant Currency. | • ECF 159-1, at ¶ 9 (Parties' Stipulated Facts)<br>• TR 1 at 52:12-16 |
| 24.  The Defendant Currency was contained in plastic shopping bags, with some of the Defendant Currency in vacuum-sealed or shrink wrap plastic packaging. | • GEX 1, at 8-12<br>• TR 1 at 52:15-16<br>• TR 1 at 80:12-22 |

| PROPOSED FACTS | TRIAL EVIDENCE |
|---|---|
| 25. The Defendant Currency consisted primarily of small-denomination bills, mostly in the $20 denomination. | • GEX 1, at 15<br>• TR 1 at 81:15-23 |
| 26. The Defendant Currency did not have any bank bandings or markings. | • GEX 1 at 17<br>• TR 1 at 79:6-23 |
| 27. The Defendant Currency had not recently been withdrawn from a bank or other financial institution. | • TR 1 at 79: 6-23<br>• TR 1 at 80:23-25<br>• TR 1 at 82:7-10 |
| 28. Daniel Flint was not at any point a diplomat recognized by the United States Department of State | • GEX 10<br>• TR 1 at 105:4-6 |
| 29. Daniel Flint was convicted of 49 U.S.C. §46314(a),(b)(2): Entering an Airport Area in Violation of Security Screening Requirements for moving the Defendant Currency through airport security while avoiding security screening. | • GEX 12<br>• GEX 13<br>• TR 1 at 109:9-10<br>• TR 1 at 110:2-11 |
| **Shumake and His Agents' Involvement with the International Human Rights Commission ("IHRC")** ||
| 30. Beginning in or about May 2015, Shumake was appointed "Head of Mission" to the United States for the IHRC. | • CEX 62<br>• TR 1 at 61:20-25<br>• TR 1 at 236:23-25 |
| 31. Flint, Darrin Coleman, and Douglas Hampton were lawyers who worked as agents for, and at the direction of, Shumake. | • TR 1 at 236:20-25, 237 1-8 (Flint & Hampton)<br>• TR 1 at 238: 7-25 (Flint & Hampton) |

6

| PROPOSED FACTS | TRIAL EVIDENCE |
|---|---|
| | • TR 1 at 241: 7-14 (Coleman) |
| 32. Flint, Coleman, and Hampton each, at certain points, acted as couriers carrying currency at Shumake's direction, purportedly for IHRC purposes ("Shumake's Couriers"). | • TR 1 at 47:1-8 (Flint)<br>• TR 1 at 100:9-24 (Coleman)<br>• TR 1 at 101:5-13 (Hampton)<br>• TR 2 at 107:23-25, 108:1-5<br>• TR 2 at 109:5-9 |
| 33. Shumake paid his couriers a fee of "a few thousand dollars." | • GEX 18a, at 80:5-81:15<br>• TR 2 at 104:8-19 |
| 34. Shumake's Couriers carried both IHRC and personal funds, which were at times commingled. | • TR 2 at 108:8-18<br>• TR 2 at 109:5-15<br>• TR 2 at 110:3-6 |
| 35. A company controlled by Shumake, Shumake Global Partners, entered into a joint venture with an arm of the military of Tanzania in or about 2015 (the "Tanzania Project") | • CEX 81<br>• CEX 82<br>• TR 1 at 226:17-25 |
| 36. The Tanzania Project did not "kick-off" as planned and was "mothballed" by no later than March of 2017. | • TR 2 at 64:11-25<br>• TR 2 at 73:3-15 |
| 37. Based on the delay in the Tanzania Project, Shumake directed Andy Knights to leave Tanzania and travel to California to work on a marijuana cultivation project at Via Real. | • TR 2 at 64:11-25<br>• TR 2 at 73:11-25 |
| 38. Shumake was responsible for procuring "materials" for the Tanzania Project. | • TR 2 at 62:13-25<br>• TR 2 at 71:9-20 |

7

| **PROPOSED FACTS** | **TRIAL EVIDENCE** |
|---|---|
| 39. Shumake testified at trial that the Defendant Currency consisted of donations solicited for use in the Tanzania Project. | • TR 1 at 239:12-25<br>• TR 1 at 242:2-14<br>• TR 1 at 247:12-22 |
| 40. The Tanzanian government does not conduct business solely in cash. | • TR 2 at 72:13-24 |
| 41. The supplier for the Tanzanian project did not conduct business solely in cash. | • TR 2 at 71:23-25, 72:1-4 |
| 42. Shumake entered into a commercial lease on behalf of the IHRC in or about June of 2017. | • CEX 65<br>• TR 1 at 256:4-16 |
| **Prior Seizures from Shumake's Couriers** ||
| 43. Prior to June 2017, two of Shumake's Couriers (Coleman and Hampton) had funds they carried seized by law enforcement in 2016 (the "Prior Seizures"). | • TR 2 at 112:8-25 |
| 44. In total, law enforcement seized approximately $592,140 from Shumake's Couriers in 2016. | • TR 2 at 112:8-25<br>• TR 2 at 113:9-16 |
| 45. As of June of 2017, no funds from either of the prior seizures had been returned. | • TR 2 at 112:8-25 |
| 46. One of Shumake's Couriers in the Prior Seizures was carrying a direction letter similar to the Direction Letter that Flint was carrying (the "Coleman Letter"). | • GEX 18A, at 21<br>• TR 1 at 100:9-23 |

8

| PROPOSED FACTS | TRIAL EVIDENCE |
|---|---|
| 47. The Coleman Letter is similar to the Direction Letter, but did not reference the Vienna Convention, nor state that the courier "shall not be detained or abated" | - <u>Compare</u>: GEX 18A at 21 <u>with</u> GEX 7 at 1. |
| 48. Shumake provided the Coleman Letter to Coleman, as his "diplomatic courier" | - GEX 18a, at 76:20-77:16<br>- GEX 18a, at Exhibit 1 |
| 49. The Direction Letter and the Coleman Letter bear the same signature. | - <u>Compare</u> GEX 7, at 2, <u>with</u> GEX 18a, at 21. |
| **Shumake's Involvement with Marijuana Cultivation and Sale Prior to the Seizure of the Defendant Currency** ||
| 50. Shumake first became involved in the marijuana business in 2015 or 2016. | - GEX 18a, at 22:21-23; 50:9-14<br>- TR 1 at 259:11-16<br>- TR 2 at 99:1-4 |
| 51. Shumake was the founder and CEO of Louis Armstrong and Associates ("LAA"). | - GEX 18a, at 27:13-17<br>- GEX 26<br>- TR 1 at 259:17-24 |
| 52. As of 2020, LAA owned a real property in Carpinteria, California ("Via Real"), where approximately 30 employees grew marijuana. | - GEX 18a, at 27:16-21; 36:11-24<br>- GEX 26 |
| 53. Shumake knew during the relevant period that banks would not accept money associated with marijuana businesses, including LAA. | - GEX 18a, at 37:13-38:13<br>- TR 2 at 99:5-7<br>- TR 2 at 100:2-5 |
| 54. The purchase price for Via Real was $5,560,500 with a | - GEX 26 |

9

| PROPOSED FACTS | TRIAL EVIDENCE |
|---|---|
| deposit of $50,000 and the full amount of the purchase price due at close of escrow. | • TR 2 at 15:5-15<br>• TR 2 at 140:21-25, 141:1-2 |
| 55. In June of 2016, Shumake was arrested in Anderson, California, in Shasta County. | • TR 1 at 130:16-25, 131:1-3<br>• TR 1 at 261:21-25, 262:1-11 |
| 56. During his arrest in Anderson, Shumake stated that he was attempting to start a purported "marijuana collective" | • TR 1 at 141:4-12 |
| 57. During his arrest in Anderson, Shumake stated that his purported marijuana collective was named Louis Armstrong and Associates ("LAA"), or a variation on that name. | • TR 1 at 151:2-7 |
| 58. During his arrest in Anderson, Shumake stated that he was in Shasta County at that time to purchase marijuana and land for growing marijuana. | • TR 1 at 141:4-18<br>• TR 1 at 151:20-25, 152:1-5 |
| 59. During his arrest in Anderson, Shumake stated that he believed there was "big money" that could be made through a purported marijuana collective. | • TR 1 at 142:18-24 |
| 60. During his arrest in Anderson, Shumake admitted that he had visited marijuana grow locations that day in order to purchase marijuana. | • TR 1 at 141:13-15<br>• TR 1 at 142:8-13 |
| 61. Prior to his arrest in Anderson, Shumake had visited at least one illegal | • TR 1 at 142:8-13<br>• TR 1 at 143:13-15 |

10

| PROPOSED FACTS | TRIAL EVIDENCE |
|---|---|
| marijuana cultivation location that day. | |
| 62. During his arrest in Anderson, Shumake claimed at least $121,730 in United States Currency which was found by law enforcement at the scene of the arrest (the "Shasta Currency"). | • TR 1 at 140:10-12<br>• TR 1 at 145:20-25, 146:1 |
| 63. The Shasta Currency consisted primarily of small-denomination bills, and was not bank-banded or marked. | • TR 1 at 146:20-25, 147:1-3 |
| 64. Shumake knew during the relevant period that marijuana was illegal under federal law. | • GEX 18a, at 45:25-46:9 |
| 65. For tax years 2016 and 2017, Shumake owed "a few hundred thousand" dollars in back taxes, which was still due in 2020. | • GEX 18a, at 21:19-22:9 |
| 66. On or about March 17, 2017, LAA entered a purchase agreement for real property located at 3500 Via Real, Carpinteria, California "Via Real property" for the purpose of growing marijuana. | • CEX 79<br>• TR 2 at 23:7-10 |
| 67. LAA had marijuana "clones" on the Via Real property in 2017. | • TR 2 at 29:8-10 |

//

//

11

Dated: February 20, 2024

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture & Recovery Section

      /s/
DAN G. BOYLE
TARA B. VAVERE
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA