EDWARD M. BURCH, CSBN 255470
DAVID M. MICHAEL, CSBN 74031
LAW OFFICE OF MICHAEL & BURCH, LLP
One Sansome Street, Suite 3500
San Francisco, CA 94104
Telephone:   (415) 946-8996
E-mail:        edward@michaelburchlaw.com

Attorneys for Claimant ROBERT SHUMAKE

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **No. CV-18-670 PVC** |
|       Plaintiff, | **CLAIMANT SHUMAKE'S POST TRIAL BRIEF** |
| v. | |
| $148,145.00 IN U.S. CURRENCY, | |
|       Defendant. | |
| _____/ | |
| ROBERT SHUMAKE, | |
|       Claimant. | |
| _____/ | |

## I.      Introduction

Claimant Robert Shumake's case was detailed, documented, and corroborated – the Defendant funds were donations he solicited for a charitable housing project in Africa from individuals gainfully employed in non-drug trades.

The glaring, fatal flaw in the Government's case at trial is that Mr. Shumake put forth direct *and corroborated* evidence that he (1) had not yet grown any marijuana to sell at the time the Defendant currency was seized, and (2) was not

obligated nor motivated to, nor did he, ever contribute or control any of the capital in his sole, fully-funded joint marijuana business in Santa Barbara. The Government put forth no evidence whatsoever, not a whiff, tending to controvert this. The Government's two legal theories – that Mr. Shumake's seized Defendant donations were (1) "proceeds" of a marijuana sale or (2) intended to be used to facilitate marijuana sales – are therefore completely foreclosed *as a matter of fact*.

Attempts to impeach Mr. Shumake, trying to show he was generally dishonest or "desperate" to make quick money from marijuana are wholly inconsequential, even *if* successful (which they were not). The Court does not have to believe or credit Shumake – the documentary evidence and Shumake's un-impeached witness (and the Government's own witnesses) plainly established the key facts. Second, even if we accept *arguendo* that Shumake was desperate to make money off marijuana sales, it was conclusively proven that he had not *yet* achieved this goal, and that the goal would not have been furthered by contributing money to his fully funded marijuana venture which had yet to grow any marijuana.

What remains was at best a weak, circumstantial, and vague case purporting to show that the money itself was generally suspicious and was being dishonestly concealed during transit. Yet, even if established, those two factors have long and repeatedly been held to fall far short of even providing probable cause that seized currency was substantially connected to *drug* violations. [1]

This is especially true here where the insufficient circumstantial evidence (large amount of cash not coming directly from a bank plus dishonesty about

---

[1] *See, e.g., United States v. $30,060.00*, 39 F.3d 1039, 1041 (9th Cir. 1994); *United States v. $49,576.00*, 116 F.3d 425, 427-428 (9th Cir. 1997); *United States v. $ 17,700.00*, 2008 U.S. Dist. LEXIS 96938, *11-16 (C.D. Cal. Nov. 6, 2008); *United States v. $31,990*, 982 F.2d 851, 853-5 (2nd Cir. 1993); *United States v. $271,080*, 816 F.3d 903, 909 (7th Cir. 2016); *United States v. $41,800.00*, 2010 U.S. Dist. LEXIS 109672 (D.P.R. Oct. 14, 2010).

transporting it) was met with a specific, corroborated, and uncontroverted case that (1) Shumake had not sold any marijuana to have obtained any marijuana proceeds, and (2) consistent with longstanding necessities and practices, the cash in this case was intended for documented and corroborated charitable purposes in Africa. That one of the lawyers Mr. Shumake hired to transport his cash exhibited patently bizarre behavior does not suffice for forfeiture of the money as *drug* related.

To stretch those weak, non-drug related aspects of the money to the point where one could say the money was from or for marijuana, requires the pure, unfounded speculation that Mr. Shumake, or someone else, had some other marijuana operation somewhere other than in Santa Barbara, something for which there is absolutely no evidence. The Court should find that the Government did not come close to meeting its burden of proving any connection, let alone a substantial one, between Mr. Shumake's seized donations and drug sales.

## II. Facts Here

### A. Shumake's Case

Mr. Shumake testified (**Tx1 at 182—267; Tx2 at 7—49**; **81—142**), and Andy Knights testified (**Tx2 at 52-78**) to corroborate the key points of Mr. Shumake's testimony. As the Government conceded, "there's no reason to doubt Mr. Knights's testimony. He was credible, forthright and direct." **Tx2 at 154:25— 155:2**. Both the documents introduced into evidence by the parties and the Government's witnesses only further corroborated the key points of Mr. Shumake's testimony.

### B. Narrative Summary of Facts Established By Shumake

Born and based out of Detroit, Michigan, Mr. Shumake came to establish himself as a successful businessman with a focus in real estate in the late 1990s through the 2010s. Through this work, he entered the political sphere and then became a humanitarian doing much charitable work, including in Africa, in places

that were cash based societies, so it was by necessity his practice to travel to Africa with large amounts of cash to accomplish his many humanitarian projects.

By 2012-2013, Mr. Shumake's endeavors in Africa were so extensive that he was formally recognized by the U.S. Department of State after being appointed as an honorary consul by Botswana and Tanzania. Around this time he met Andy Knights, a decorated former Army construction engineer who also had extensive experience in east Africa. The two traveled to Ireland with a team researching affordable housing technology, and then to Tanzania to propose bringing such housing to communities there.

As a result, in September 2015, Mr. Shumake inked a large deal with the engineering division of the Tanzanian military to complete housing and other projects both for profit and charity. Mr. Shumake immediately began fundraising for the projects, and materials were purchased and shipped to Tanzania. Some of the donations Mr. Shumake solicited were seized by law enforcement in transit in 2016-2017, including the Defendant currency here, seized on July 25, 2017. Notwithstanding, everyone involved in the Tanzania projects still believed through *at least 2018* that the projects would come to fruition.

Meanwhile, back in 2016, Mr. Shumake began exploring entry into the legal marijuana industry in California. Mr. Shumake formed a medical collective, registered with the Secretary of State, and traveled to cannabis country in Northern California, but the scouting trip did not go well – he was ripped off by one of the locals who was showing him around, and then by local authorities, who instituted a prosecution and forfeiture action against him, both of which failed after Mr. Shumake was acquitted of all charges by a jury.

Not to be deterred, in 2017, Mr. Shumake split his marijuana company (which had yet to actually touch any marijuana) into a for-profit side and a non-profit side in the wake of California's legalization of recreational marijuana sales.

With the help of an attorney he registered a new, second entity with the Secretary of State. Mr. Shumake found and secured a large tulip farm near Santa Barbara, recruited a team including investors, and spearheaded a joint venture to go from tulip farm to marijuana farm. The joint venture was fully funded with millions of dollars from the investors, and at the start of 2018 still had millions of dollars in capital accounts; Mr. Shumake contributed $0 in capital as there was no need for him to contribute any capital, and he had no access to the team's capital.

Among the team in Santa Barbara was Mr. Knights, whom Mr. Shumake recruited in spring 2017 to oversee the farm conversion's construction and compliance. Mr. Knights arrived to a property in "deplorable" condition; was paid by the attorney of that venture, got some work done in his weeks spent there, but when he left on June 13, 2017, the farm was only about "23/25 percent complete," no marijuana was growing, and the large team was months away, at best, from growing any marijuana.

In the end, Mr. Shumake got back most of the money seized from him, except the Defendant donations at issue here. That Defendant currency was seized on July 25, 2017, barely over a month after Mr. Knights left the farm in Santa Barbara, so the money was obviously not the proceeds of any marijuana sale – as there was no marijuana to sell, which Mr. Knights confirmed – nor intended for anything marijuana related. Rather, as Mr. Shumake testified and corroborated with documents and Mr. Knights' testimony, the donations were for the charitable side of the housing project in Africa.

## C.    The Relevant Facts With Citations To The Transcript

### 1.    Shumake Was A Skilled and Established Businessman and Diplomat For African Countries

Mr. Shumake was born in Detroit, Michigan in 1968 to parents who were

pastors at a small church; his dad a military man. **Tx1 at 183:3-14**. A death in the family resulted in his father's move out of state and Mr. Shumake being raised primarily by his mother under, at best, financially challenging circumstances. **Id. at 183:15-23.**

In the mid 1980s, Mr. Shumake graduated high school and eventually earned a track scholarship to a small university in Michigan, and then transferred to a historical black college university in Atlanta. **Id. at 184-185**. He did not finish university and went back to Detroit and began working a union janitor job at the Ford Motor Company factory there circa 1992. **Id. at 185.** While working at Ford, Mr. Shumake taught himself about business with audio books and the like, and started a pager company in late '93/ early '94 with a college fraternity brother. **Id. at 185-186.**

### i.   Mr. Shumake's Business Background

Mr. Shumake grew the pager business (with his business partner), "Boss Communications," into a million dollar endeavor while still working at Ford. **Id. at 186-187.** In the mid-1990s, Mr. Shumake left Ford and began to pursue real estate, and, utilizing another college classmate connection, became a mortgage broker, learned to underwrite mortgages, and continued to expanded his business and finance knowledge. **Id. at 187:10-18.** Mr. Shumake then purchased his own (first) piece of real estate, turned a profit, and in the late 1990s "became full-time in the real estate investment marketplace …. I bought and sold properties, I developed properties, I built properties." **Id. at 188-189**.

Mr. Shumake never went back to school to earn a degree, but because of his success in real estate, was able to do much philanthropic work and was therefore given an honorary doctorate from Lewis College of Business, a historical black college university in Michigan circa 2001. **Id. at 190-191.**

1
2
3

   **ii.**  **Mr. Shumake's Success in Real Estate Led to Involvement in Politics and Then Philanthropic Work In the United States and Abroad**

4
5
6
7
8
9
10
11
12
13
14
15
16

  Mr. Shumake's success in real estate, including financial success, allowed him entry into, first local politics, then national, and then international, as we will see. **Id. at 189:2-4; 191:6—192:6.** Mr. Shumake, through a friend, met former president George W. Bush when he was making his first run for president and ultimately became one of Bush's top black fundraisers under age 40. **Tx1 at 193—194; Exh 56.** In the 2000s, Mr. Shumake continued to fundraise for President Bush, continued his real estate business, and was even given formal positions in President Bush's government. **Tx1 at 195—196.** Namely, Mr. Shumake was "appointed to the Federal Housing Finance Board commonly known as the Federal Home Loan Bank Board [vis-à-vis] Indianapolis … on the housing [ ] and the finance committee" during Bush's first term, and also became "kind of an adviser to the HUD secretary, … to try to find solutions to make it more affordable for individuals to buy homes." **Id. at 196—197.**

17
18
19
20
21
22
23
24
25
26
27

  In the 2000s, Mr. Shumake's involvement in real estate, politics and government helped expand his skills as well as his social and professional networks. **Id. at 198—200.** This included meeting and being invited by Winnie Mandela to travel to Africa for the first time, which catalyzed a commendable body of philanthropic work there, including "with children, to do philanthropic work with water, all the types of things." **Id. at 200:5-18.** Mr. Shumake worked on the apartheid museum in South Africa (**id. at 201:9-10**), "adopt[ed]" thousands of HIV orphans, building libraries and schools in Ethiopia (**id. at 202—203; Exh. 52**), did clothing drives in Ghana and the Dominican Republic and Haiti and helped build water wells for clean running water in Kenya and Tanzania (**Tx1 at 205: Exh. 59**), and did trade missions and brought young black Americans who

28

had "never been out of the country or sometimes out of [their] city to [ ] Africa to connect with their ethnicity" and learn about other cultures and peoples, "for many years" (**Tx1 at 208**). Mr. Shumake took "maybe a few hundred kids to Africa [ ] through a program called the Youth Ambassador[s]." **Id. at 207.**

As a result of this philanthropy, Mr. Shumake was appointed honorary consul, formally recognized by the U.S. Department of State, for at least two African countries (Botswana and Tanzania) from 2012 through 2015, and was given diplomatic privileges. **Tx1 at 106-7; 200:18-19; 214:9-10; Exh. 11 ¶ 2; Exh 64.** An honorary consul is "appointed by another country [but] [t]he U.S. will still have to accept that appointment." **Tx1 at 216:7-9.**

> [A]n honorary consul is an honorary ambassador for [a foreign] country. So you're a U.S. citizen [but] essentially like a business concierge or business liaison for those countries. [I]f a person [from a foreign country], as an example, comes to the United States, they're driving on the opposite side of the road, they hit somebody, they get thrown in jail. They have challenges in trying to communicate, understanding the languages [and] what's going on here. I would get a call [and] go to negotiate to get them out [and] back to their country[,] [ ] try to coordinate that.
>
> [An honorary consul would also for example] bring more awareness [of] those countries. So, [ ] Botswana in southern Africa [was a] large exporter of diamonds [and] to bring more awareness to people [here] of what Botswana did.
>
> Tanzania [ ] in East Africa [is] known for Tanzanite, [ ] another stone [and] for their minerals and [ ] things.
>
> I also was appointed to Trinidad [and] Tobago[ ] in the Caribbean[.] … I'm using the wrong word -- a business liaison, but [ ] you're working and [ ] representing those countries [so] you had [official] diplomatic immunity specifically for that purpose. You were sworn in by that country and you received your diplomatic credentials by the U.S. state department.

**Tx1 at 214—215**. [2]

Mr. Shumake's work in and connection to Africa was well documented at trial (*e.g.* **Exh. 53, Tx1 at 219—221**, Shumake with presidents of Zanzibar and Ghana, and Ambassador to Botswana circa 2013-2014; **Exh 54, Tx1 at 222,** Shumake with president of South Africa circa 2013; **Exh. 58, Tx2 at 49**, Shumake with children during a trade mission to South Africa circa 2013, **Exh. 59**, **Tx1 at 205—206**, Shumake with fmr. President Obama's grandmother in Kenya circa 2015 during water projects) and never controverted by the Government.

Mr. Shumake continued his involvement in politics into the 2010s, fundraising to a lesser degree and working on an inaugural ball in Washington D.C.. **Tx1 at 218—219.**

### iii.   The IHRC – Mr. Shumake's Intended Vehicle for Further Philanthropic Work In Africa

In ~2014/2015, Mr. Shumake became associated with the International Human Rights Commission ("IHRC") after he was introduced to the IHRC's then head of mission, Mohamed Chande while in Tanzania. **Tx1 at 230—231**. IHRC was an intergovernmental organization (IGO), comparable to the United Nations but obviously much less prominent, in that different countries would have to join to create such an organization that was functional/operational, and in the case of the IHRC, several countries including Pakistan were signatory, but the United States was not. **Id.** at 231—232. Mr. Shumake eventually became "deputy chairman" and "head of mission to the United States of America" for the IHRC in

---

[2] Shumake's appointment as honorary consul by Trinidad and Tobaggo was not formally recognized by the U.S. Department of State because the process ended up taking so long that the ambassador who made the appointment left his post and Shumake was not re-appointed by the incoming ambassador. **Tx1 at 217:10-16.**

May 2015, "to enhance and develop the formal diplomatic/working relationship, and 'Humanitarian Mission' for the people of the United States of America[;] [t]he Department of Foreign & International Affairs of the [IHRC] hope that the Government of the United States of America will extend all possible assistance … to perform his responsibilities." **Id. at 232—234; Exh 62**.

When Mr. Shumake began with IHRC, it had expanded through Africa and the Caribbean, but "was really not organized" and did not have a "U.S. presence." **Tx1 at 236:20—237:3.** Mr. Shumake therefore recommended to IHRC and hired attorneys Douglas Hampton and Daniel Flint to be part of the project "to help me put together kind of infrastructure to go about in the U.S." **Id. at 237:4-8.**

> IHRC was pretty much a name only. … So I [hired attorneys Hampton and Flint to] do background research on how to put together a structure, an infrastructure within the United States and around the world. Being that there was no recognized IHRC in the U.S., how do we organize and put this all together. That's what these attorneys began to do.
> That was their creation to create the structure. How to raise [ ] capital to that process, what that looked like. Everything from the donation letters, to the appointment, the donation letters, the receipt documents, the entire process from that process.

**Tx1 at 238:11-25.**

By 2016, Mr. Shumake opened an IHRC office in Nairobi, Kenya which served as the IHRC headquarters in Africa, which he rented from Regus, a company that leased office space in the United States and abroad. **Tx1 at 259, Exh. 69**; *see also* **Exh 65**. Through Regus, he also opened an IHRC office in Georgia, and later in Los Angeles**. Tx1 at 255—257; Exh. 65**.

      **2.**       **Shumake Inked A Deal, Years in the Making, for For-Profit and Charitable Housing in Africa That He Was Actively Working On and Fundraising For At The Time The Defendant Donations Were Seized**

As noted, Mr. Shumake's projects and ties to Africa were so extensive that two African countries appointed him honorary consul, appointments formally recognized by the U.S. Department of State from 2012 to as late as fall of 2015. ***E.g.* Exh. 11 ¶ 2; Tx1 at 106—107; Exh 64** (Shumake's Dept. State ID card).

During this time, through his frequent trade missions and other work in Africa, Mr. Shumake negotiated into a letter of intent to contract with Tanzanian government entities, and then raised money to begin, a rail project to connect communities on the outskirts of that country together. **Tx1 at 225:3-13.** Though that project did not ultimately come to fruition, Mr. Shumake via his company Shumake Global Partners, having learned from shortcomings of the rail project, then catalyzed and executed (on September 5, 2015) a joint venture agreement to do "shipping, fishing, housing, humanitarian work, and a few other specific things," this time having the engineering branch of the Tanzanian Army form its own company ("SUMAJKT") to be one of the partners in the agreement. **Tx1 at 224—227; Exh 81** (joint venture agreement); **Tx2 at 61:9** (Andy Knights describing SUMAJKT).

That joint agreement came about because in "late 2013, early January timeframe of 2014," Mr. Shumake was introduced to Andy Francis Knights by one of Mr. Knights' co-workers in Detroit, "[h]e's doing [ ] a lot of work that you've probably done over in Africa [so] [y]ou need to meet him," and they went to dinner. **Tx2 at 59:25–60:1-6**.

Mr. Knights was a military man, rose in the ranks and became an engineer in the U.S. army and ultimately a Colonel in the army's Corps of Engineers, before

retiring from the army after some ~27 years. **Tx2 at 52-54.** Mr. Knights was chief of facilities and construction, responsible for "27 countries in the Middle East to include all of the Stans …[a]nd pretty much most of the countries on the East coast of Africa [s]o Kenya, Tanzania, you know, going down the coast." **Tx2 at 55:1-7.** Among Mr. Knights' military experience, he oversaw construction on the ground for five combat tours in the Middle East. **Tx2 at 55-56**. After the military, Mr. Knights became and is to this day employed in construction and engineering in the private sector, where he continued to work in Africa and the Middle East. **Tx2 at 56-57.**

After meeting, Mr. Shumake and Mr. Knights were among a team of individuals who in early / mid 2015, traveled to Ireland to visit a factory where a company, Greenspan, had designed and manufactured an apparently innovative "Sup-RWall™" concrete framework building system for better affordable housing, ultimately procuring an exclusive license agreement from the company to do the whole continent of Africa for this housing (except for Zimbabwe and Nigeria). **Tx1 at 229;** *see also* **Tx2 at 61:3-6** (Knights: we "went to Ireland to visit the factory so that Robert can see the factory because Robert was interested in building homes for SUMAJKT in Tanzania").

Not long thereafter, a team including Mr. Shumake and Mr. Knights traveled to Tanzania, where Mr. Knights "gave a high level briefing to the Tanzanian Army with Robert there and a couple of other folks. And the briefing was about, you know, how we can build them low income houses and also donate some of the houses to them, too." **Tx2 at 61:15-19.** *See also* **Tx2 at 62:1-4** (Knights re: timing). As noted, the Tanzanian Army as SUMAJKT ultimately entered into a significant joint venture with Shumake Global in September 2015. **Exh 81.**

On September 13, 2016, the next year, after the military general who was original signatory to the joint venture had retired, Mr. Shumake wrote to the new

Claimant's Post Trial Brief
Case No. 18-cv-00670 PVC

Brigadier General / CEO of SUMAJKT, formally introduced himself, congratulated the general on his new position, and updated him on aspects and progress of the joint venture. **Exh. 82;** *see also* **Tx1 at 228—229.** Notably, the letter explained,

> The primary purpose of this partnership is to fund and manage a variety of projects identified as profitable and vital to the economic future of the Republic of Tanzania. High quality, energy efficient and Affordable Housing is our first phase of execution. Our objective is to develop a business model that would address the 300,000 unit deficit for military and local community housing. Additionally, we will bring new technologies that train and employ both military and civilian personnel. To date, we have invested and committed $5 million USD ($10.9B TZS) to establish, develop and manage a housing factory capable of building 10,000 new homes per year.
>
> [¶] To that end, we have secured exclusive licensing rights to an internationally acclaimed, "Best in Class" concrete framework building system, Greenspan's Sup-RWall ™ from Ireland …[which] will provide high-quality, affordable housing, better, faster and stronger than traditional options. We have executed a short-term lease and are in the process of shipping the equipment to build the first factory in Tanzania.
>
> [¶] Our first container with building material has already arrived in Dar es salaam, the second will arrive on September 13th with subsequent shipments to follow. Our goal is to be prepared to launch by October 1, 2016. We will send a core team of experts to Tanzania to train and develop our housing manufacturing plant.

**Exh 82 at 1.** The letter goes on to provide further detail for the above plans. **Id. at 2.**

### i.      IHRC and The Charitable Aspect of The Affordable Housing Project

The SUMAJKT project was indirectly related to Mr. Shumake's IHRC/humanitarian work in that the particular type of affordable housing with

which Shumake Global Partners had exclusive license was to also be utilized as charitable housing for those in need in Africa (*see generally*, **Tx1 at 235—238**), IHRC would allow Shumake "a larger platform … [to] give away homes to people who could not even afford them, would build those homes and give them away" so "raised capital for them[.]" **Tx1 at 237:14-16.** Mr. Shumake was therefore "running around the country, raising capital from people that wanted and had an affection to Africa, that wanted to contribute to the continent[;]" Shumake was "the super salesman to go around and share with people what we were able to do." **Tx1 at 238:2-3.** *See also* **Tx2 at 61:15-19** (Knights briefed SUMAJKT that there would be "donat[ion] [of] some of the houses [ ] too"); **Tx2 at 63:17-25** (Knights testifying that there was to be a charity part of the affordable housing project).

Shumake in fact raised capital for the affordable housing project, [3] from around the time he became appointed as IHRC's "Head of Mission" in May of 2015. **Tx1 at 239:14—240:3**; **Exh 62.** Among the money Mr. Shumake raised for the affordable housing project, was the funds ultimately and respectively seized from Doug Hampton in Atlanta and Darren Coleman [4] in Charlotte, in 2016. **Tx1 at 240—241**. Mr. Shumake had planned to meet both in San Francisco to obtain

---

[3] For ease of reference, Mr. Shumake herein often refers to these endeavors as the "affordable housing" project, because the housing to which Shumake secured exclusive license was the primary aspect of the endeavors on which Shumake was focusing at the time, but not the sole aspect. *See, e.g.,* **Exh 81 at pp. 3-4** (joint venture agreement indicating other areas of investment); **Tx1 at 226** (Shumake testimony about other aspects).

[4] Coleman was "an old friend and colleague [who] had spent a lot of time on the continent with me [and] was the president of the Botswana American Chamber of Commerce[,] had been to Ethiopia, [ ] so he actually assisted me with the other company, Shumake Global Partners [and] was also someone I recommended [ ] to become a courier with IHRC as well. [The $252,000] are funds that I raised out of Atlanta [ ] part of it was from a rapper and also a gentleman that owned a casino." **Tx1 at 241.**

the funds. *E.g.* **Exh. 17 at 1 ¶ 13.**

> ii.     **The Defendant Cash Seized on July 25, 2017 Was
> Donations for The Affordable Housing Project, En
> Route To Shumake in LA**

In May and June of 2017, Mr. Shumake met with Brian Kennedy and
Kenneth Caldwell in California to persuade them to donate to the affordable
housing project. **Tx2 at 30-31**. Kennedy was a successful, multi-Grammy winning
music producer based out of Los Angeles, who had produced songs with artists
like Rihanna and Beyonce; Mr. Shumake had been in Kennedy's home and his
music studio. **Tx1 at 242, 244-245**; **Tx2 at 30.** Caldwell was a restaurateur, with
restaurants in Los Angeles and Chicago; Shumake had personally been in multiple
of his restaurants. **Tx1 at 245:10-19**; **Tx2 at 31:8-11.**

Mr. Shumake ultimately solicited donations from Kennedy and Caldwell for
the charitable aspect of the affordable housing project. **Tx1 at 244:19-21, Tx1 at
247:12-14, 247:19-23 (**Kennedy); **Tx1 at 245:7-9** (Caldwell).

In ~late June/early July 2017, Mr. Shumake told Kennedy and Caldwell that
someone would pick up cash from them when it was available, and in July 2017,
Mr. Shumake directed Flint to pick up cash donations that Shumake had solicited –
which Shumake believed were from Kennedy and Caldwell – in Chicago from one
of Caldwell's restaurants ("Harold's Chicken Shack"), and told Flint to travel to
Los Angeles with that cash. **Tx1 at 242:2-6; Tx1 at 249-250; Tx2 at 33:17-34:7;
Tx2 at 34:17-35:10; Tx2 at 35:23-25**.

Shumake was, in 2017, spending half of his time in southern California, near
the Los Angeles International Airport (LAX) – he "was prospecting [a place for a
legal marijuana business] in that area" (*see infra*) – so as noted had arranged to
have an IHRC office in Los Angeles **(Tx1 at 255-257**; **Exh. 65)** from where he

intended to fundraise, and from there could, "if we [ ] raise[d] enough funds to take overseas to Africa rather than having multiple trips." **Tx1 at 257:21-23**. In other words, "[o]ur office [in L.A. is] where we would procure capital in that office, then take a flight from L.A. directly to Ethiopia." **Tx2 at 114:24—115:1** (emphasis added).

On July 25, 2017, Flint flew from Chicago's Midway International Airport to LAX, carrying what was labeled a "diplomatic pouch" containing the Defendant $148,145.00 in currency as well as a number of documents regarding IHRC, and refused to allow law enforcement to search it; instead Flint referred agents to, and contacted, Mr. Shumake, who in turn gave law enforcement consent to search the pouch. **Fact Stipulation, Doc. 159-1 at ¶¶ 1-2, 5-8.**

Specifically, Flint told law enforcement that he was an attorney, working for Mr. Shumake vis-à-vis the diplomatic pouch with the currency (**Exhibit 2**; **Tx1 at 47**:**1-9**). *See also* **Tx. 76:19—77:2, 84** (DEA Agent indicating Flint said he was working for Shumake and it was Shumake's bag and money). When asked for consent to search the pouch, Flint told law enforcement that he wasn't authorized to go into the pouch without clearance from Mr. Shumake, and that only Shumake could provide consent. **Tx1 at 48:4-10; Tx1 at 48:22-49:1; Fact Stipulation ¶¶ 5-7**. Flint, with law enforcement still present and listening, called Shumake over speakerphone, and Shumake without objection or dispute gave agents consent to search the pouch. **Tx2 at 49-50; Fact Stipulation ¶¶ 6-7**. *See also* **Tx1 at 76-77, 84, 95:19-24** (Flint was working for Shumake that day as Shumake's attorney and Flint disclaimed ownership of the money and claimed attorney client privilege in regard to the money). Agents of course seized the currency.

### iii.   The Affordable Housing Project Was Still In The Works Through At Least 2018

From at least September 2015, through 2016, through July 2017 (when the

Defendant donations were seized), and into 2018, the housing project was still alive – i.e. those involved believed it would come to fruition. *E.g.,* **Exh. 81** (formation of joint venture in September 2015); **Exh. 82** (Shumake letter to SUMAJKT in September 2016 indicating materials had been shipped and more were expected to ship)**; Tx1 at 242:2-6; 244:19-21, 245:7-9, 247:12-23, 249—250, Tx2 at 30-31, 33:17-34:7; 34:17-35:10, 35:23-25** (Shumake solicited donations from Kennedy and Caldwell for the housing project); **Tx2 at 64:1-8** (Mr. Knights indicating that in 2018 he was in touch personally with one of the logisticians "to see how much longer it was going to take to get [the shipped materials] off the port").

### 3. It Was Necessary to Bring And Use Cash to Accomplish Anything in The African Areas in Which Shumake Worked

The parts of Africa wherein Mr. Shumake did his humanitarian endeavors were cashed based societies. **Tx1 at 209-211; Tx1 at 236:6-7; Tx1 at 240:21-23** (Shumake testimony). Mr. Knights corroborated that Africa was a (U.S.) cash based society at the time. **Tx2 at 58** ("Africa, to me, is different from any other place to do business in that it's what you call a cash society. So it was nothing for my lieutenants, captains, majors to have cash just like you guys have probably seen in the movies that depict service members going out with cash and pretty much doing operations because that's just how it is. It's a cash society. I call it 'Christmas money'. We gave people Christmas money. That's how we won hearts and souls and minds.") *See also* **Tx2 at 58:24—59:10** (Knights elaborating, would never cut a check for anything, "[i]t was all cash and they all dealt with U.S. cash at the time.")

On cross-examination, Mr. Knights explained that, even if certain government entities in Africa themselves might accept non-cash payments, the

"workers and everyone else in government" would require cash; "equipment, cameras and trucks" would all require cash payments. **Tx2 at 72:20—73:2.**

### 4. Shumake Had Only Just Began Trying to Get Into The Legal Marijuana Business and Had Not Achieved His Goals To Make Money From Marijuana By The July 25, 2017 Seizure

In "2016-ish," Mr. Shumake became interested in entering the legal marijuana business in California, so hired a lawyer "to put together the structure based upon how California was organized at the time" and thereby created a "nonprofit mutual benefit corporation" called "Louis Armstrong & Associates after the jazz musician Louis Armstrong because he was [a marijuana smoker]." **Tx1 at 259-260; Exh 74** ("Louis Armstrong & Associates, LLC" Articles of Organization filed with Secretary of State April 18, 2016). Shumake hoped to make money from the marijuana industry and use it for charitable projects in Africa. **Tx2 at 138—139.**

### i. Shumake's Failed Look Into Northern California Marijuana in 2016

In summer 2016, Mr. Shumake traveled to and was spending time in Northern California, including being in Anderson, California in Shasta County on June 5, 2016, looking for real properties to do what "I had done with my private equity firm ... buy the properties and lease it out to people [for] cannabis." **Tx1 at 261:13—262:3;** *see also e.g.* **Tx1 at 130—131** (Anderson Police Department Officer Halligan re: Shumake statements on June 5, 2016). Mr. Shumake was "looking for land and also trying to get an understanding of this whole cannabis industry through different strands [of marijuana]. This strand versus another variant. That I didn't have knowledge in, but I knew real estate." **Tx1 at 262:6-10**. Consistent with his previous success in non-marijuana related real estate, where

Mr. Shumake would buy undervalued properties, and then once the market for the particular use for that real property "stabilized," he would sell it off for a profit, Mr. Shumake intended to do the same vis-à-vis marijuana farms in Northern California, i.e. he would buy a farm for cheap before the legal California marijuana industry expanded from medical to recreational and sell after that expansion and presumable increase in value. **Tx1 at 262—263**.

To that end, Mr. Shumake was in an area that was new and unknown to him to do "networking, meeting different people in the space to make introductions to me, [and going] to several locations." **Tx1 at 263—264.** *See also* **Tx1 at 141** (Officer Halligan testifying that Shumake said he was "in the process of forming a medical marijuana collective, and that he was there to meet with potential growers and procure marijuana, as well as land for his medical marijuana collective.") **Tx1 at 150:16-19, 151:3-7, 151:12-16, 152:2-4, 157:4-9** (Officer Halligan indicating that Mr. Shumake had Louis Armstrong and Associates, LLC documentation with him, and that Shumake said he was in Anderson scouting for that marijuana entity).

Mr. Shumake's time scouting ended poorly, and he never procured any land or marijuana [5] – worse, he was arrested and prosecuted, and the large sum of cash he had for his purposes was seized by law enforcement, after having some of the cash stolen by his driver and/or the Anderson Police Department. **Tx1 at 265—266; Tx2 at 8—9.** In 2019, Mr. Shumake was acquitted of all charges in Shasta County by a jury and his money, less what was stolen, was returned to him a couple months later. **Tx2 at 7:13—8:13; Tx1 at 149:12-13, 163.**

### ii.   Shumake's Fledgling Southern California Marijuana Venture in 2017

After his "wildly unsuccessful" attempt to enter the marijuana industry in

---

[5] *See, e.g.,* **Tx1 at 154** (Shumake said no marijuana was his and no marijuana was found in the suitcase with the money).

Northern California, Mr. Shumake started looking in Southern California. **Tx2 at 10:19-25.**

In early 2017, "[t]hrough some relationships that I had met in that area," Mr. Shumake found a piece of undervalued real property, "that had been a tulip farm, in Santa Barbara [at] 3500 Via Real." **Tx2 at 19:24—10:10**.

With the help of an attorney, Mr. Shumake "bifurcated" his Louis Armstrong and Associates business so that the original LLC would be for profit and would acquire and own the real estate, while the other (Louis Armstrong and Associates, Inc.") would be non-profit and would deal with the actual marijuana. **Tx2 at 10:11—11; 15:21—16:3,** *see also,* **Exh. 74** (Louis Armstrong and Assoc., ***LLC,*** Business Entity No. 201611210612), **Exh. 76** (Louis Armstrong and Assoc., ***Inc.***, (New) Business Entity No. C3998524, Articles of Incorporation for Non Profit Corporation, filed February 28, 2017); **Exh. 75** (Louis Armstrong and Assoc., Inc., Statement of Information, filed March 18, 2017).

Mr. Shumake negotiated to acquire 3500 Via Real, and ultimately acquired a lease option for Louis Armstrong and Associates, LLC to buy 3500 Via Real for $5 million – the LLC would put an initial $50,000 good faith deposit, then another $210,000 after the negotiation period, and by closing time on the option, a total of $500,000 "down." **Tx2 at 13—15.**

To accomplish the purchase and the conversion of 3500 Via Real from flowers to marijuana, Mr. Shumake put together a team to fund and co-manage the venture, with investors contributing over $3 million dollars in contribution capital. **Tx2 at 13, 15, 16—18; Exh 26 at 17; Tx2 at 20:10-12;** *see also* **Tx2 at 76:16-19** (Knights' testimony, "Q. Was it your understanding that Mr. Shumake was the sole owner of the Via Real property? A. Oh, I know that wasn't true because it was a whole bunch of them.")

While Mr. Shumake "spent a couple thousand dollars" for initial "soft cost

1  dollars" of legal fees, travel, wining and dining, paying the brokers, … to put this
2  deal together," he was not required to nor did he contribute any of the $3 million
3  plus contribution capital to the Louis Armstrong's 3500 Via Real project, and the
4  project had plenty of capital on hand through the start of 2018. **Tx2 at 19:6—**
5  **20:12, Exh. 26 at p. 17** (Shumake testimony and Operating Agreement re: capital
6  contributions); **Tx2 at 24:10—26:13, Exh. 78 at pp. 22-36** (Louis Armstrong and
7  Associates, LLC tax returns, prepared by the managing director John Goldstein,
8  with K-1s reflecting that Shumake had $0 in his capital account at the start of 2018
9  and $0 at the end of 2018, while the other partners began 2018 with almost $2
10 million total capital still in their accounts).

11     3500 Via Real, a roughly 10 acre plot with hoop houses and a greenhouse
12 was "a good piece of property but it needed some loving care". **Tx2 at 21**. In
13 March 2017, the new Louis Armstrong and Associates, LLC partners gained access
14 to 3500 Via Real, and Mr. Shumake called on his trusted construction engineer Mr.
15 Knights to come fix up the property to make it suitable for legal marijuana
16 growing. **Tx2 at 64:16-21**.

17     Mr. Knights did his research to follow all state laws. **Tx2 at 65:6-16**.  Mr.
18 Knights came to a property that he viewed as "deplorable … was really in a bad
19 shape" with, for example, rotting wood on the structures (**Tx2 at 66:8-20)** and
20 where people were actually in the process of harvesting flowers for mother's day
21 (**Tx2 at 65:24-66:5**). The property also needed, for example, an office (**Tx2 at**
22 **22:18**) as well as new electrical and water filtration systems before it could grow
23 any marijuana (**Tx2 at 21:7-8; Tx2 at 66:6-19**).

24     In spring 2017, Mr. Shumake was personally present at 3500 Via Real while
25 being a part of overseeing its renovations, living in Carpentaria, nearby, about two
26 weeks out of the month. **Tx2 at 23—24.** Mr. Knights was there as well but had two
27 personal events for which he needed to, and did, leave 3500 Via Real to be back

28

home in Alabama: May 16th for his wife's birthday and June 15th for his anniversary. **Tx2 at 64:23-24; Tx2 at 67:12-14.** On his first stretch from March to May 2017 before the birthday, a path was formed for materials that had been ordered but had not yet arrived. **Tx2 at 67**. By Mr. Knights' second stay at 3500 Via Real, from ~ May 20 to June 13, 2017, materials were still delayed but he oversaw completion of a pad and framing for "dry out buildings." **Tx2 at 68:1-11**.

By *June 13, 2017* when Mr. Knights left 3500 Via Real for the last time, *"[n]o marijuana was being grown*. And, in fact, it couldn't grow because it would have been a violation of the California code at the time, because they had no fumigators, okay. They had no UV lights, they had no translucent panels. They had none of the -- they had no cameras at the gate. We had no gate that they could secure per the regulation and the place was not ready for operation." **Tx2 at 68:14-22** (emphasis added).

"[B]y the time I left, it might have been about 50 percent complete for the electrical, and if I were to give my assessment on where -- when I left on June 13th for my anniversary on the 15th, we probably were about 23 percent complete -- 23/25 percent complete, and by law that does not give you the right to do anything, you know, like growing." **Tx2 at 69:10-17. "**[Not] much [ ] got accomplished from March and June on the Via Real property … [Mr. Knights] ended up doing, like I said, a lot of the civil, the form work and being able to try to get the electrical work done." **Tx2 at 76:10-15**.

Mr. Knights was paid for his work at 3500 Via Real, but not by Mr. Shumake, instead he was paid "by the lawyer" with a combination of cash and checks, and the lawyer paid usually with a credit card for any expenses that came up that Mr. Knights needed and requested. **Tx2 at 69:21-24; 74:13-17**; **75:6-9**.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### D.   The Government's Case

#### 1.   The Seized Cash Did Not Come Directly From A Bank and *Flint* Was Dishonest

##### i.   Task Force Agent Williams

The Government called Wesley Williams, a then task force agent for the FBI, who was called to establish the facts surrounding the interrogation and search of Flint at LAX on July 25, 2017. **Tx1 at 25—71.** The Government utilized Williams to emphasize that Flint avoided security screening at the airport in Chicago, and at LAX refused consent to search of his luggage, including the diplomatic pouch with the Defendant currency.

With the locked diplomatic pouch, Flint also carried documents with indicia of IHRC and Mr. Shumake, and as noted, Flint referred law enforcement to Shumake, who upon contact, "without objection or dispute gave agents consent to search the pouch in Flint's possession." **Tx1 at 31—32**, **Fact Stipulation ¶ 7.**

Mr. Shumake testified that he did not tell Flint to attempt to avoid screening or a search of his bag, and to the contrary, his understanding was that avoiding TSA screening "was actually against the protocol," (**Tx2 at 43:7-11**), rather, his understanding of the protocol the attorneys came up with in regard to when donations were carried was " … clear transparency …[y]ou put it through the conveyor belt and you send it through the conveyor belt, it would come through and that was it." **Tx1 at 250:5-8.** *See also* **Tx2 at 43:12-17** (Shumake never told Coleman or Hampton to avoid TSA screening).

Indeed, nothing in the documents Flint carried indicated he should avoid TSA screening (**Tx1 at 58: 23-25)** and to the contrary the documents that he carried upon which he based his claims of diplomatic immunity plainly indicated that he did not have current diplomatic privileges or entitlement to avoid TSA screening at that time (**Tx1 at 59—61, Exh. 61**, Flint carried a copy of the Vienna

Convention, which indicated on the first page that it was "not yet in force"); **Tx1 at 61—62:4, Exh. 62**, IHRC document indicating it appointed Mr. Shumake as "Head of Mission" to the U.S. and that IHRC "*hope*[s] that the Government of the United States of America will extend all possible assistance" to Mr. Shumake in that role") (emphasis added). *See also* **Tx1 at 68**: "[Flint] printed out [ ] the Vienna convention to show us that [ ] the stuff that was referenced in the letters authorizing him to do what he did as a diplomat were legitimate.")

To be sure, Neither Hampton nor Coleman tried to avoid a TSA search (**Tx1 at 119:2-10**), and Flint, a lawyer (**Tx1 at 63:3-9**), admitted to having done his own research to determine that he could avoid security screening and avoid searches of the pouch (**Tx1 at 62:19—63:1**).

Furthermore, Mr. Shumake testified that his lawyers drafted all of the documents and "direction letters" utilized as part of the process that they came up with when carrying donations for his IHRC related endeavors, and the lawyers affixed his electronic signature which was on file to said letters, and specifically that Flint drafted the direction letter he carried which added language not present in the Coleman letter, for reasons of which Shumake had "no idea." **Tx1 at 250—252**; **Tx2 at 130, 135—136**.

Whereas Coleman's letter in 2016 relatively perfunctorily indicates money was being carried and would be used in Africa in the Caribbean, Flint's letters in 2017 suddenly adds reference to the Vienna Convention, that he "shall not be detained or abated in any way and the contents of your bag may not be seized or forfeited," that the money will be also used for projects in the United States (in addition to Africa and the Caribbean), "[a] portion of these deposits shall be utilized as a down payment on real estate transactions in northern California," and that "[a]lthough your assignment shall not be impeded in any way, please be

courteous with all TSA officials and/or law enforcement[.]" **Id.** [6] *See also* **Tx2 at 131—132** (Shumake characterizing mention of down payment for real estate transactions as "another error in the document").

### ii.   DEA Agent Prestwood

The Government called DEA special agent Steven Prestwood (**Tx1 at 73-92**), primarily to authenticate the photographs of Flint and the seized currency, and describe the currency, including that some was in plastic wrap, none had bank wrappers, it was in various denominations including a lot of $20 dollar bills, and "it didn't look like it came from some sort of form of financial institution; a bank." (**Tx1 at 82**).

### iii.   FBI Agent Simon

The Government called Agent Simon (**Tx1 at 93—128**) apparently to testify that he read a report/s that, prior to the July 25, 2017 incident with Flint, Darren Coleman was carrying $252,000 for Shumake for IHRC in North Carolina and Douglas Hampton was carrying $170,000 for Mr. Shumake from Atlanta, and Mr. Shumake was found with the large amount of money in Shasta county. Agent Simon also read and introduced **Exhibits 10 & 11** into the record, U.S. Department of State letters which indicated that IHRC nor Flint ever had any recognized diplomatic status with the U.S. Department of State, but that Mr. Shumake indeed was registered and recognized by the U.S. Department of State as honorary consul for Tanzania and Botswana and was "accorded official acts immunity" from 2012 through 2015. Agent Simon testified that IHRC did not have "501(c)(3) status" as a charitable organization in the United States. **Tx1 at 107—108**.

Agent Simon also testified that Mr. Flint was charged and convicted of

---

[6] As the Government's witness testified, neither this language, nor anything in the letter, indicates that TSA screening into a sterile area of the airport should or could be avoided. **Tx1 at 59:2-8**.

1
2
3

"entering an airport area in violation of security requirements," **Tx1 108—110**.of bringing "something … unscreened" into the "sterile area of an airport" (**Tx1 at 117:20-21 & 118:10-12**).

4

5

### iv.    Anderson Police Department Officer Halligan

6
7
8
9
10
11
12
13

The Government called former Anderson Police Department officer Michael Halligan to testify as to his encounter with Mr. Shumake in June of 2016. *See also* Section C(4)(i), *supra* Officer Halligan was monitoring an individual named Rebecca Lions, a "broker of marijuana deals," who was on supervised recognizance for drug charges, Ms. Lions had been to several locations in Shasta County associated with the sales of marijuana, and was at the "GAIA" hotel in Anderson when Halligan encountered Mr. Shumake in one of two vehicles there. **Tx1 at 131—136**.

14
15
16
17
18

Officer Halligan found marijuana, currency in mylar bags, and incomplete medical marijuana collective papers in the Toyota, and in the Chevy Blazer, was Mr. Shumake, Ms. Lions and a Mr. Jiles, who said he was working as "Mr. Shumake's security due to Mr. Shumake having a large amount of U.S. currency with him." **Tx1 at 139:7-9.**

19
20
21
22
23
24
25
26
27

There was indeed a large amount of currency in the trunk of the Chevy as well, in mylar bags in a suitcase; Mr. Shumake claimed to own the currency. **Tx1 at 139—140, 158:24—159:2.** Mr. Shumake indicated that "he had traveled to Shasta County due to forming a -- or being in the process of forming a medical marijuana collective, and that he was there to meet with potential growers and procure [i.e. purchase] marijuana, as well as land for his medical marijuana collective" (**Tx1 at 141**) which, as noted, he indicated was called Louis Armstrong and Associates, LLC and for which he carried documentation (**Tx1 at 150:16-19, 151:3-7, 151:12-16, 152:2-4, 157:4-9**). Mr. Shumake said he had visited several

28

grow sites, to meet potential growers for his collective, but he had not purchased any and that the marijuana in the Toyota was not his. **Tx1 at 141—142,** (Ms. Lions told Office Halligan that she had marijuana with her that day. **Tx1 137:21— 138:4**.)

Office Halligan testified that the money found in the suitcase in the Chevy was found with "count sheets," pages of a small note pad from a local hotel which Officer Halligan believed to correspond to amounts of money/marijuana; Mr. Shumake stated that the "sheets" were not his. **Tx1 at 144-145**. Mr. Shumake testified that he was not aware of the the sheets until Officer Halligan showed them to him, and his realization, formed "upon listening to Officer Halligan talk about the two different bags of money in two different cars," was that Mr. Jiles had "robbed" him of some of his money. **Tx1 at 265:22—266:6**. [7]

Mr. Shumake claimed the money was from his business/es, including referring to Shumake Global Partners" (**Tx1 at 147—148**) and accompanied Officer Halligan to the police station in an effort to obtain the return of his money which Officer Halligan seized. **Tx1 at 149, 158. (**As noted, criminal charges were brought, but Mr. Shumake was acquitted of all charges and his money was returned to him in 2019.)

### v.    Paralegal Tarleen Khauv

Ms. Khauv is a paralegal for the U.S. Attorney's office in Los Angeles who

---

[7] Though Officer Halligan's testimony is a bit disjointed as to what was found where, his testimony confirms that the currency was found in two different vehicles, as Mr. Shumake testified. Officer Halligan initially indicated that he found marijuana in two different bags within the Toyota, with a trash bag of marijuana next to currency in mylar bags in the trunk, and a backpack of marijuana in the back seat (**Tx1 at 136**), but later seemed to state that Ms. Lions said she had marijuana in the Chevy (**Tx1 at 137:21—138:4**), that there was a suitcase with more money in the trunk of the Chevy (**Tx1 at 139:18-23**), and then again that the marijuana was found in the Toyota (**Tx1 at 142:3-5**).

was called to introduce documents establishing certain aspects of the litigation resulting from the seizure of $252,000 in Charlotte, North Carolina from Mr. Coleman (**Tx1 at 165—177**), a litigation which resulted in a settlement where the Government returned half of the money to the IHRC (**Tx2 at 41; Exh. 80**).

## III.    Argument - The Government Fell Far Short of Its Burden at Trial

The Government's burden at trial – contrary to its repeated implications – was to prove by a preponderance of evidence that *the* Defendant $148,145 was in fact substantially connected to marijuana sales. It fell far short of that. It is not enough for forfeiture to show that Mr. Shumake was involved, or intended to be involved, generally in marijuana growing and sales.

### A.    The Government Was Required To Prove That The Money Came From Marijuana Sales or That Shumake Had More Than "unrealized intentions" or "speculative, inchoate plans" To Use The Money For Marijuana Sales Violations

18 U.S.C. § 983(c)(1) indicates plainly that "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture" and to establish that the seized $148,145.00 here is subject to forfeiture, the Government must prove that such property was "money[ ] furnished [ ] by any person in exchange for" marijuana or "proceeds traceable to such an exchange" (21 U.S.C. § 881(a)(6)). The Government also pursued an alternative theory of forfeiture which requires it prove by a preponderance of evidence that "money[ ] [was] intended to be used to facilitate [marijuana sales]." 21 U.S.C. § 881(a)(6).

Under either of those theories, "the Government shall establish that there was a substantial connection between the property and the offense[,]" 18 U.S.C. § 983(c)(3), as the "substantial connection" is required "if the Government's theory of forfeiture is that the property was used to [ ] facilitate the commission of a

Claimant's Post Trial Brief
Case No. 18-cv-00670 PVC

criminal offense," (facilitation theory) "**or was involved in the commission of a criminal offense**" (exchange/proceeds theory) (*id.*) (emphasis added).

The Government repeatedly argues that it need not prove a particular or specific drug transaction, only citing a single Ninth Circuit case for the proposition, *United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006, 1013 (9th Cir. 2013).

Actually, in *$11,500.00,* the Ninth Circuit, merely in passing in dicta, stated only that "[t]he government [need] not prove a link between the currency and a specific act of drug trafficking[,]" and may obtain forfeiture with "sufficiently strong circumstantial evidence linking the currency to drug trafficking in general" by pointing only to *United States v. $42,500.00*, 283 F.3d 977, 984 (9th Cir. 2002), a case that, importantly, *pre-dated CAFRA's burden shift*, and thus was decided under the old, lower probable cause burden (*id.* at 980), [8] and where the evidence that the money was connected to drug trafficking was overwhelming compared to here.

In *$42,500.00*, most importantly, the Government produced an *undisputedly* "sophisticated" dog alert to the currency, i.e. uncontroverted evidence that the dog would "not alert to cocaine residue found on currency in general circulation [but] [r]ather, [only] alerts to a by-product of cocaine which does not linger on currency[,]" meaning the dog "would not alert to money unless it had **recently been in the proximity of cocaine**" (emphasis added), which the court "recently held … [was] an important factor in determining probable cause [for forfeiture]."

---

[8] Indeed, the *$42,500.00* Court emphasized under that old probable cause burden, the Government needed only establish "reasonable grounds to believe a connection existed between the property and drug activities, supported by more than mere suspicion but less than prima facie proof …. not an exacting standard." (emphasis added). Such is no longer a valid statement of law since CAFRA raised the burden from mere probable cause to preponderance of evidence.

283 F.3d 977, 982.

Moreover, in *$42,500.00,* the claimant initially had stated that she had "obtained [the currency] from an unknown man, [it was] to be delivered to another man, identified only as Jose, and [she] denied knowing who owned the funds" (283 F.3d 977, 982), then in discovery she changed her story, saying it belonged to another individual, "Gary Lankford," for whom she repeatedly refused to provide any identifying or contact information (other than his name) or any other documents relating to the source or purpose of the money (283 F.3d 977, 980-983).

The Court concluded that it was an "ever-expanding, contradictory, sophistical, and impenetrable story about the initially unknown and now effectively unidentified and hidden, alleged owner of the money" (283 F.3d at 984) and the concurrence went so far as to suggest that the claimant's attorney had violated the rules of ethics in the process of proffering the story (*id.* at 985). Therefore, the Court held that the Government on that record was entitled to summary judgment *under the former, significantly lower probable cause standard*.

Such a state of affairs is a far cry from the present case, where the Government, now required to prove its case by a preponderance of admissible evidence, did not even have any kind of dog alert to begin with, let alone a "sophisticated" dog alert and the laundry list of "sophistical" claims that allowed the Court in *$42,500.00* to hold that the circumstantial evidence was enough for mere probable cause given the utter lack of evidence on the claimant's side.

Therefore, it is debatable at best that the Government in the post-CAFRA, higher preponderance burden still need not prove "a specific act of drug trafficking," but regardless, the statement that the Government need not prove "a specific act of drug trafficking" only means that the Government was not required to prove that Shumake took X pounds of marijuana to X location on X date and met with person B who gave Shumake X amount of money in exchange for said

amount of marijuana. It does *not* mean that the Government did not have to prove by a preponderance of evidence that in fact, some marijuana was sold by Shumake (or someone else) *in order to obtain the Defendant currency*, or that the currency was going to be used to facilitate some actual future sales – that much is in the black letter text of the statutes.

Indeed, the statutes explicitly indicate that "the burden of proof is on the Government to establish, by a preponderance of the evidence, that" Shumake's seized $148,145.00 … was "money[ ] furnished [ ] by any person in exchange for" marijuana or "proceeds traceable to such an exchange[.]"  For a proceeds theory, the Government must prove by a preponderance of evidence that an exchange/s for marijuana in fact occurred, even if they do not have to prove every detail of the exchange/s.

Certainly, the Government could legally obtain forfeiture on its alternate facilitation theory, but the Ninth Circuit has, since *$11,500.00,* 710 F.3d 1006, clarified as to such a theory that § 881(a)(6) does not "reach either back to unrealized intentions or forward in time to speculative, inchoate plans[.]" *See United States v. $11,500.00 in United States Currency*, 869 F.3d 1062, 1070-71 (9th Cir. 2017).

In other words, while the Government does not have to put forth evidence of the specifics of a marijuana sale or sales, it still must prove that a marijuana sale occurred, *or* that Shumake had some intent that goes beyond "speculative, inchoate plans" vis-a-vis marijuana sales with specific regard to *the money* sought to be forfeited. The Government did not do this, especially in the face of Shumake's extensive, documented, *and corroborated* evidence that was never controverted.

The problem for the Government is that the only mention of marijuana at trial was Shumake's fledgling Louis Armstrong and Associates, LLC venture, and Mr. Shumake put forth direct, corroborated, documented and uncontroverted

evidence that the venture had not yet sold any marijuana and that he had no obligation nor motivation to put any money into that fully funded venture.

This is fatal to the Government's case because a large amount of money being carried by someone who is evasive and dishonest has long been held insufficient to meet even the old probable cause for forfeiture burden. *See*, *$42,500.00,* 283 F.3d at 981-982 ("A large amount of money standing alone, [ ] is insufficient to establish probable cause [for forfeiture]."); *United States v. $49,576 U.S. Currency*, 116 F.3d 425, 427-8 (9th Cir.1997) (cash to which an unsophisticated dog alerted, where carrier "use[d] of a fake driver's licence, [and gave] evasive and dishonest answers to questions, and [had] general nervous behavior" was insufficient for even probable cause"); [9] *United States v. $30,060.00*, 39 F.3d 1039, 1041 (9th Cir. 1994) (unsophisticated drug dog alert to currency, "packaging and amount of the money" consistent with drug trafficking, and the claimant's "false accounts of the money's source and his own employment record" did not amount to even the lower probable cause standard).

Hypothetically, the Government could have proved, by a preponderance of evidence, that Shumake had some *other* marijuana venture that had, or could have, yielded or needed a large amount of money, but it did not do so. There is no evidence in the record to support that.  The Government merely put forth evidence that Shumake was involved in a fledgling marijuana venture, which Shumake did not contest. They completely failed to put any evidence to contradict that Mr. Shumake's joint marijuana venture had not yet yielded any marijuana sales

---

[9] Notably, *$42,500.00,* 283 F.3d at 982-983 emphasized that "[w]hile some of the facts in *$49,576 U.S. Currency* are similar to the present case, our treatment of drug dog alerts has become more discriminating since we decided that case, and key factors differ [because] [i]n this case, Sutter's alert is afforded greater weight due to the undisputed evidence that Sutter had sophisticated training and would not alert to generally circulated currency." (citing published, binding authority)

proceeds and did not need any more funding. The Government thus did not prove by any standard that the $148,145, or any of Shumake's money, was proceeds or intended to be used to facilitate any marijuana violations.

## B.    The Government's Proceeds Theory Fails Miserably

Again, the Government's vague, equivocal theory relies on Shumake's involvement with the currency – this is the only link in the case to any drugs, i.e. marijuana. Therefore, the Government's arguments at trial that Shumake somehow did not put enough evidence on to allow the Court to conclude that the Defendant currency was his, is as strange as it is unavailing.

### 1.    Shumake Proved The Defendant Currency Was En Route to Him, Sourced From Donors Not Involved in the Drug Trade

As outlined, Mr. Shumake conclusively established with documentary evidence and corroborating witnesses that since 2015, he and others worked and traveled and otherwise arranged for a multi million dollar deal with the Tanzanian military which included donating housing that was to be built in cash-based Africa, that materials had been ordered and shipped, and that all concerned believed through summer 2017 that the project would be coming to fruition. *See* **Section II(C)(2) & (3)**, *supra, see also* **Section III(C)(1)**, *infra*.

Mr. Shumake testified competently that in summer 2017, he met with successful music producer Brian Kennedy and successful restaurateur Kenneth Caldwell in May and June of 2017 to solicit donations toward the housing project. **Tx2 at 30-31; Tx1 at 242, 244-245**; **Tx2 at 30; Tx1 at 245:10-19**; **Tx2 at 31:8-11.** Shumake was successful **(Tx1 at 244:19-21, Tx1 at 247:12-14, 247:19-23; Tx1 at 245:7-9)** and in July 2017 told the two donors that someone would pick up the donations when available, directed Flint to pick up what Shumake believed

were the donations at one of Caldwell's restaurants *in Chicago*, then Shumake told Flint to travel to Los Angeles with the donations to give them to Shumake there, where Shumake had opened an IHRC office and was spending half his time (**Tx1 at 242:2-6; Tx1 at 249-250; Tx2 at 33:17-34:7; Tx2 at 34:17-35:10; Tx2 at 35:23-25**; **Tx1 at 255-257**; **Exh. 65).**

Sure enough, on July 25, 2017, Flint turns up at LAX, on a flight from Chicago, with money he says is not his but instead is Mr. Shumake's, for whom Flint says he is working; Shumake is called and confirms it is his money and that agents can open the bag with the money. **Fact Stipulation, Doc. 159-1 at ¶¶ 1-2, 5-8; Exhibit 2; Tx1 at 47:1-9; Tx1 at 48:4-10; Tx1 at 48:22-49:1; Tx2 at 49—50; Tx1 at 76-77, 84, 95:19-24.**

Though not *direct* evidence that the funds Flint was carrying were donations to Mr. Shumake's (charitable) affordable housing/IHRC project, from Kennedy and Caldwell – two individuals having nothing to do with the drug trade and instead gainfully employed in non-drug related trades – the fact-finder here has more than enough competent and admissible evidence to make that quite reasonable, if not obvious, inference. *See, e.g.,* Ninth Circuit Model Civil Jury Instruction 1.12 (2017 Ed., updated August 2023) ("Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.")

## 2.    The Government Offered No Evidence to Suggest An Alternative Source of The Money

Despite having the burden of proof, instead of producing *evidence* that there was some other source of the Defendant money (other than Kennedy and Caldwell), or there was other marijuana, or some other grow site from which Mr.

Shumake could have obtained marijuana to sell, the Government simply argues that the money came from some unidentified marijuana sales from some unidentified individual/s.

"It must be remembered, however, that in a civil forfeiture action the government is the plaintiff, and it is the government's right to forfeiture that is the sole cause of action adjudicated [so] [i]f the government fails to meet its burden of proof ... the claimant need not produce any evidence at all." *United States v. Funds in the Amount of $239,400*, 795 F.3d 639, 646-47 (7th Cir. 2015) (emphasis added) (quoting *United States v. $125,938.62*, 537 F.3d 1287, 1293 (11th Cir. 2008)).

Regardless of the *strength* of Shumake's evidence that the Defendant donations were from Kennedy and Caldwell, two individuals gainfully employed in non-drug trades, the Government carries the burden of proof here and simply lacks evidence, or even coherent speculation, that there was an alternative, source, let alone a drug related source. *See, e.g.,* Ninth Circuit Model Civil Jury Instruction 1.12, *supra*, (comment indicating, "[for] example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night. However, other evidence, such as a turned-on garden hose, may provide a different explanation for the presence of water on the sidewalk … [simply] consider all the evidence in the light of reason, experience, and common sense.")

The Government only points to the amount, packaging, and concealment of the money to purportedly "prove" that it was from marijuana sales, but as established, these factors (even when combined with other evidence indicating a drug connection, which evidence is not present here) have long been found to not even suffice for the lower former probable cause for forfeiture standard, *even when the claimant's explanation for a legitimate source was absent or dubious*. *$49,576*, 116 F.3d at 427-8 (dog alert, "use of a fake driver's license," and "evasive and dishonest answers to questions [and] nervous behavior" insufficient for probable

cause of drug forfeiture); *$30,060.00*, 39 F.3d 1039, 1041 (dog alert, "packaging and amount of the money" consistent with drug trafficking, "false accounts of the money's source and [ ] employment" insufficient for probable cause of drug forfeiture).

Notably, while Flint was being evasive and nervous by refusing to allow a screening or search of the pouch with the currency, he disclaimed the money and identified it as Shumake's, and Shumake was contacted and did not hesitate when asked for consent to search or to say that the money was his. Mr. Shumake's other donation couriers neither evaded screening nor otherwise attempted to shield their respective donations from discovery by law enforcement. Thus, Flint's evasiveness should not be attributed to Shumake in the first place. *United States v. Approximately $77,000.00 in United States Currency*, No. 1:11-cv-01251 GSA, 2012 U.S. Dist. LEXIS 50404, at *18-19 (E.D. Cal. Apr. 10, 2012) (factors such as nervousness and illogical explanation of travel by driver carrying cash – that he did not claim – should not be attributed to the claimant who did claim the cash but was not present during the vehicle stop and seizure).

Does the Government propose that it is Flint's money from drug sales? Flint has no drug sales history. **Tx1 at 87:18—88:4**. Moreover, where are Flint's statements or testimony to contradict that he picked up the money from Caldwell at his restaurant? There is none, he did not testify. The Government could have easily subpoenaed him, but did not. For that matter, the Government could have, but did not call or obtain any testimony from Caldwell or Kennedy to contradict Mr. Shumake. *See* **Tx2 at 47—48**.

Thus, even if Mr. Shumake's evidence as to the source of the currency could have been *more* robust, Mr. Shumake conclusively proved that he had no marijuana to sell *and* the Government proffered no evidence to which the Court could look to counter Shumake's evidence, to support an alternative source. It is

the Government's burden of proof, not Shumake's. The Government did not carry its burden of proof as to the source of the currency being from someone other than Kennedy and Caldwell.

Given that Mr. Shumake conclusively proved that he had no marijuana to sell, the Government's theory remains an unstated mystery, they have not and cannot even verbalize from where they believe the money came, other than simply saying that it came from some unidentified marijuana sales because of the "totality" of circumstances.

If the Government's theory is that Mr. Shumake had and sold marijuana to obtain the currency, where is the evidence that he ever grew or otherwise obtained any marijuana, that can be said to counter his direct and corroborated testimony that he had not yet grown marijuana? There is none. Nothing about the money itself suggests that it was from marijuana. It didn't smell like marijuana, and the Government did not even proffer that its amount or packaging was consistent with marijuana trafficking – the testimony from their law enforcement officers was merely that it seemed like it did not come directly from a bank. Merely because it did not come directly from a bank certainly does not demand or even warrant a conclusion that it was from *drug* sales (*see e.g.,* footnote 1, *supra,* citing cases), especially in the face of evidence tending to suggest it was from non-drug sources. Moreover, Mr. Caldwell owned a restaurant in Chicago, so it is not surprising that the money did not come directly from a bank.

The Government points to the seizure of money from Mr. Shumake in Shasta County. Yet, Shumake was acquitted by a jury of being involved in drug sales there and the jury found specifically that that money was not drug proceeds. [10] Officer Halligan did not have any new evidence that would allow this Court to

_____

[10] And, even if one assumes *arguendo* that the Shasta county money was from drug sales, Shumake did not have access to it in 2017.

find differently, and regardless, Halligan merely confirmed what Shumake maintained from day one as to his being in Shasta County with money – he was scouting for Louis Armstrong and Associates, LLC. The evidence was conclusive and uncontroverted that Louis Armstrong and Associates, LLC had not grown any marijuana by July 25, 2017, let alone sold any.

From what evidence could this Court look to infer that Mr. Shumake had some other grow or some other marijuana? Mr. Shumake's marijuana business was above board, operating with a California license and filed publicly with the Secretary of State. Where is the evidence that he had a grow other than Via Real in California or anywhere? There is none. How did Mr. Shumake get this fantastical marijuana to Chicago? There is no evidence, not a whiff. No credit card records, no flight records, no car rental records, nothing, just vague speculation that some apparently large amount marijuana was apparently taken to Chicago, somehow, on some unspecified day.

The Government instead merely beats the drum of needing only a "totality" of facts that suggest a connection to drug sales, but "[r]eliance on the mantra 'the totality of the circumstances' cannot metamorphose [ ] facts into" an actual connection to drug violations without "concrete reasons for such an interpretation," *United States v. Wood,* 106 F. 3d 942, 948 (10th Cir. 1997) (extreme nervousness and unusual travel plans with stated inconsistencies by someone with drug history did not give rise to reasonable suspicion of crime). The Government does not even verbalize a theory for who obtained and sold marijuana, and the vague speculation falls far short in the face of Mr. Shumake conclusively proving that he did not have any marijuana to sell by July 25, 2017.

The question is: what is more likely, that the money was, perfectly consistent with Mr. Shumake's long and established background, practice and necessity, from specific donors for a specific, years-in-the-making project in which

1  many people, time, money, and materials had already been invested, as Mr.

2  Shumake's and Mr. Knights' testimony and the documentary evidence reflected

3  with great detail, or was it from some unspecified sale of some unspecified drug by

4  some unspecified person for which there is no actual evidence?

5  Mr. Shumake put forth corroborated evidence that the money was donations

6  to a charitable project in Africa. Mr. Shumake put forth corroborated evidence that

7  he had never sold any marijuana. Despite that the Government has the burden of

8  proof here, it put forth no evidence from which the Court could look to find that

9  the money was from some other drug-related source, only vague speculation.

### C. The Government's Facilitation Theory Is Textbook "unrealized intentions" and "speculative, inchoate plans"

The Government cannot obtain forfeiture by trying to prove that Mr.

Shumake had "unrealized intentions" in the past or "speculative, inchoate plans" in

the future with the Defendant donations. *$11,500, supra*, 869 F.3d 1062, 1070-71.

Rather, the Government must prove by a preponderance of evidence that Mr.

Shumake actually intended to use the Defendant fund to facilitate drug violations.

Mr. Shumake competently testified that he intended to use the money for the

charitable housing aspect of the Tanzania venture, and that providing money to his

fully funded joint marijuana venture was not needed nor would it have benefited

him. Both the housing and the status of the marijuana venture were documented

and corroborated.  The evidence suggesting otherwise, if you can call it that, was

vague and meager, to be charitable.

Moreover, even if we indulge *arguendo* in the wild speculation that Mr.

Shumake was lying when he said he intended the money for the housing project,

the Government offers no evidence that he had intent for that money in some

specific marijuana violation. In other words, the Government's theory is exactly

that Mr. Shumake had inchoate plans vis-à-vis marijuana violation, which is legally insufficient per *$11,500, supra*, 869 F.3d at 1071.

1. **The Government's Rhetoric That The Housing Project Had Died By Summer 2017 Is Not Only Unsupported, It Is Affirmatively Contradicted By The Evidence**

The Government seizes on Mr. Knights' colorful choice of words in describing a delay of the Tanzania housing project, and argues that his statement should be understood to mean that the project had *died* instantly before summer 2017 (when Mr. Shumake was fundraising for the project), which if true might tend to undermine Mr. Shumake's testimony on this point *if* Shumake had reason to believe it had died before summer 2017.

Yet, the Government makes much ado about nothing. Mr. Knights's statement that the project "got mothballed" (**Tx2 at 73:10-11**, " Q… what happened in 2017 with this project? A… the project kind of got mothballed …") did not mean the project suddenly came to a final halt *and* died instantly *in everyone's minds* in early 2017.

First, mothballed means postponed or kept in reserve, not instantly killed as the Government incorrectly posits. The Oxford Languages dictionary defines it in relevant part as to "**postpone work** on (a plan or project)" (emphasis added). This is consistent with *every* dictionary definition of mothball: "Mothball." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/mothball. Accessed 4 Jan. 2024 ("to withdraw from use or service and **keep in reserve** : put aside") (emphasis added); definition of mothball from the Cambridge Business English Dictionary © Cambridge University Press) ("to stop work on an idea, plan, or job, but **leaving it in such a way that you can start on it again at some point in the future**") (emphasis added).

Indeed, commonly, you use mothballs to prevent moths from eating holes

into a shirt hanging in your closet precisely *so you can continue to wear the shirt*. If your intention is to never wear the shirt, and never allow anyone else to wear it, you don't hang it in your closet and employ preservation methods, you simply throw it in the trash.

More importantly, the dictionary and common sense definition of mothballed is consistent with Mr. Knights' testimony. After explaining that he and Mr. Shumake had worked for years, since 2014, on the deal, Mr. Knights specifically testified that *through 2018* they were *still working* on the project.

> Q. And so, by 2018 are you still working on this or hoping that this is going to get worked out?
> A. Yes, sir. <u>As late as 2018</u> I was in touch – I personally was in touch with one of the logisticians <u>to see how much longer it was going to take</u> to get the containers off the port and cleared with all of the other government agencies, to include the -- what they call the Tanzanian Investment Committee or whatever.

**Tx-2 at 64:1-8** (emphasis added). In other words, Mr. Knights, *through* 2018, fully expected that the project was "going to" happen in the near future; Mr. Knights did not testify *if*, he testified *when*.

The Government never got Mr. Knights to contradict this direct testimony – it never elicited any testimony that everyone involved understood that when some materials were held up at port, the entire project along with any hopes of it coming to fruition died right then and there, because that is obviously not true.

Furthermore, the letter Mr. Shumake wrote and sent to the Tanzanian military on September 13, 2016 shows that either some materials had made it through in mid-2016, or that the first materials to get held up happened in mid 20*16*. **Exh. 82 at 1** ("Our first container with building material has already arrived in Dar es salaam, the second will arrive on September 13th with subsequent

shipments to follow.") Thus, Mr. Knights was either wrong about the year the materials got held up at port, and they actually got held up a year earlier (in 2016, not 2017), or some materials were being held up piecemeal at port since 2016. In either case, both Mr. Shumake and Mr. Knights continued to believe all through 2017 and into 2018 that, despite some materials being held up at port, those materials would still get to where they needed to go, the project would need money for, e.g., "a core team of experts … to train and develop our housing manufacturing plant …" and workers, builders, and the like to make those materials into housing. **Id.,** *see also* **Tx2 at 63:1-4** (Knights testifying, "…part of the deal was that we were going to train the locals on how to build these houses so that they can be self-sustaining and be doing the work.")

Merely because Mr. Knights began work on a different project for Mr. Shumake (the Via Real project) in spring of 2017 does *not* mean that there was suddenly no need to raise cash for "workers and everyone else" who were going to actually transport, install, and build with the materials on the ground in Tanzania – indeed, the materials had been shipped and presumably paid for at that time. **Tx2 at 72:20—73:2** (Knights explaining that while the materials might have been purchasable with non-cash options, everyone else on the ground in Tanzania needed to be paid in cash).

Consequently, the Government's attempt to assign some significance to Mr. Knights' beginning work on the Via Real project in spring 2017 is inconsequential. Mr. Knights and Mr. Shumake still believed through *all of* 2016 and 2017 that they were going to use the materials that had arrived at port in Tanzania on the ground in Tanzania, and would need cash to accomplish and realize those beliefs.

Furthermore, it is simply inconsistent with Mr. Shumake's character to be deterred by a hiccup or setback in one of his projects. Mr. Shumake had various moneys seized multiple times in 2016-2017, money earmarked respectively for

both his aspiring marijuana business and his humanitarian projects in Africa, resulting in litigation he had to and did defend, but he continued to pursue both of those respective efforts anyway. Merely because some person at the port needed to be talked to and negotiated with (**Tx2 at 63:13**) is not some catastrophic issue that would cause anyone, and especially Mr. Shumake, to immediately throw away a multi-million dollar deal that had been in the works for years, and for which many materials had been paid and shipped. To the contrary, the hold up would have the opposite effect – some port official wanting some "Christmas money" (**Tx2 at 58:10-11**) to allow the crates through to land would be all the more reason to solicit more donations quickly. [11]

Sticking with Shakespeare references, the Government's counsel doth protest too much. The Government goes so far as to argue that Mr. Shumake's own witness "completely disproves" and "directly contradicts" Shumake's stated intention for the seized donations. **Tx2 at 153:2, 155:3, 155:16**. It makes sense that the Government would make the argument – Mr. Shumake both documented and corroborated his testimony that the donations in summer 2017 were intended for a specific project in that he had been working on for years and which was ongoing at the time he solicited those funds, and which project perfectly flows from and is consistent with Mr. Shumake's well-established background and practices.

Mr. Knights did not disprove or contradict Mr. Shumake – he directly

---

[11] Similarly, the Government's half-hearted implication that Mr. Shumake's only role in the matter was to procure materials is unsupported and contradicted by the evidence. Both Mr. Shumake and Mr. Knights confirmed that there was to be both for profit and charitable/humanitarian housing. Who was going to pay the workers and everyone to actually build the housing that was free to the community? Obviously, at the very least, fundraising was required to get the free housing built and the Government elicited no testimony, contrary to Shumake's, that some other person or entity was going to foot the bill for the charitable side of the project.

corroborated that, in 2017, construction on the housing project was expected to start and cash was needed to pay people on the ground in Tanzania to build the housing and perhaps to get the materials out of port in the first instance.

### 2. Mr. Shumake conclusively proved that He Was Not Obligated or Motivated to Give Any Money To His Sole Marijuana Venture

Mr. Shumake testified that he was not obligated nor motivated to put any money into Louis Armstrong and Associates, LLC's Via Real marijuana venture. **Tx2 at 13, 15—18, 19:6—20:12, 24:10—26:13.** Mr. Knights' testimony and documentary evidence confirmed that the Via Real venture was fully funded in spring 2017 through at least the beginning of 2018, when it had still millions of dollars on hand. **Tx2 at, 69:21-24; 74:13-17**; **75:6-9, 76:16-19, Exh. 78 at pp. 22-36.**

The Government offered no witnesses, cross-examination, nor otherwise tried to controvert that Louis Armstrong and Associates, LLC's Via Real marijuana venture was fully funded and would not need or benefit from Mr. Shumake contributing any money toward the project.

### 3. The Government's Failed Attempts At Impeachment Are Wholly Inconsequential

On cross-examination, the Government attempted to undermine Mr. Shumake's credibility generally and to paint a picture that he was desperate to make a quick buck from marijuana because his other ventures had hit a dead end.

Initially, it must be quickly noted that such attempts at impeachment failed. Under Federal Rule of Evidence 608, specific instances of bad conduct by a witness may not be proven by "extrinsic evidence." Fed. R. Evid. 608.

As part of its pointless attempts to impeach Shumake's character for truthfulness, the Government inquired as to some outlandish claims purportedly

made by Shumake's former business partners. Shumake categorically denied them as false, so the Court must disregard the entire exchange, and accept Shumake's answer that the claims were false. *United States v. Olivo*, 80 F.3d 1466, 1470-71 (10th Cir. 1996) ("Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence."); *United States v. Castillo*, 181 F.3d 1129, 1132 (9th Cir. 1999) (same); *United States v. Herzberg*, 558 F.2d 1219, 1223 (5th Cir. 1977) ("This language prohibits proof by extrinsic evidence even where the prosecutor 'inquires into' prior acts on cross-examination."); *United States v. Brooke*, 4 F.3d 1480, 1484 (9th Cir. 1993) (cross examiner is "stuck with" whatever answer witness gives when cross examining about specific instances of conduct to prove character).

Even if the Government was entitled to cross examine Shumake about nonsensical allegations made by his dishonest former business partners, the Government was required to accept his answer and would not have been allowed to call the partners to rebut it (which they did not even attempt to do in any event).

This attempt to impeach Shumake adds nothing to the Government's case and does not tend to prove anything, let alone anything of consequence.

Similarly, the Government referred to Mr. Shumake being the victim of extortion by staff at the Detroit mayor's office many years ago. Yet, under Federal Rule of Evidence 608(b), the Government may cross examine about "[s]pecific instances of . . . conduct" only if the instances are "probative of truthfulness or untruthfulness" and only "in the discretion of the court." Fed. R. Evid. 608(b). While bribery might sometimes also involve lying, in this case, none of the allegations of bribery bear on Mr. Shumake's character for telling the truth, he was the victim. *E.g. United States v. Rosa*, 891 F.2d 1063, 1069 (3rd Cir. 1989) ("Bribery, however, is not the kind of conduct which bears on truthfulness or

1    untruthfulness.").

2    What remains is the Government's attempts to show that Mr. Shumake was

3    not a credible witness and that he was desperate to make money from marijuana

4    sales, both of which are not consequential in the slightest here.

5

6    **i.    Attempts to Show That Mr. Shumake Was Dishonest**
     **in General Are Meaningless Because The Court Does**

7    **Not Need To Believe Shumake to Establish The Key**
     **Facts**

8

9    The documents and Mr. Knights confirm the key aspects of Mr. Shumake's

10   testimony. The former both prove that Mr. Shumake had a long history of effecting

11   humanitarian causes in Africa, it was the premise of his meeting Mr. Knights, and

12   even the Government's own documentary evidence reflects that Mr. Shumake was

13   appointed as a diplomat to two African countries, recognized by and registered

14   with the U.S. Department of State by 2012. It does not appear that the Government

15   disputes this connection and experience with African causes, even with rhetoric.

16   The documents and Mr. Knights confirm that Mr. Shumake worked for years

17   to put together a large deal wherein affordable housing (and other projects) would

18   be donated to communities in Africa. Mr. Knights confirmed that Africa in general,

19   and entities and people who do construction on the ground in Africa, are U.S. cash

20   based. Mr. Knights and the documentary evidence show that the project was

21   ongoing, and donations/funding were needed for it, through 2016 and 2017.

22   Mr. Knights confirms that Mr. Shumake had not grown any marijuana by

23   July 25, 2017, and the documents and Mr. Knights confirm that Mr. Shumake was

24   neither in control of any of the Via Real marijuana money in 2017, and that the Via

25   Real venture was funded with millions of dollars in spring 2017 through at least

26   the beginning of 2018.

27   The Court need not believe Mr. Shumake to find the above facts established

28

Claimant's Post Trial Brief
Case No. 18-cv-00670 PVC                                              46

in evidence. It is thus uncontroverted that Mr. Shumake did not have access to marijuana. It is established and uncontroverted that in 2017 Mr. Shumake had a multi-million dollar deal with the Government of Tanzania to build affordable housing, and had decades of experience and networking accomplishing humanitarian causes in Africa.

In view of the above, it is clearly more likely than not that Mr. Shumake was able to source, and intended, the money seized in summer 2017 because of and for the uncontroverted housing project. The Government plainly then did not meet its burden of showing more likely than not that the money was sourced by or intended for some marijuana related endeavor.

### ii.      Even if Mr. Shumake Was Desperate to Make Money From Marijuana, He Had Not Yet Succeeded

As established, the documents and Mr. Knights confirm that Mr. Shumake had not yet grown any marijuana to sell, and that his marijuana venture did not need any funding, in summer 2017.

Therefore, the Government's attempts to show that Mr. Shumake turned to marijuana to make a quick buck, dubious at best, are simply inconsequential. § 881(a)(6) does not "reach either back to unrealized intentions or forward in time to speculative, inchoate plans[.]"*$11,500.00, supra*, 869 F.3d at 1070-71.

### 4.      The Government's Vague Case For Facilitation Is A Fantastical and Impenetrable Story, Supported By The Thinnest of Reeds

What remains of the Government's evidence for its facilitation theory – which it claims is strong enough to warrant the Court disregarding the documents and Mr. Knights and disbelieving Shumake – is meager at best.

Again, the Government urges the Court to reject the direct, documented and

corroborated evidence that Mr. Shumake intended the seized currency for an *ongoing* years-in-the-making project with the Tanzanian military, building houses in Tanzania *for which some of the materials had already been paid and shipped,* which was strikingly similar to his other philanthropic projects over decades.

Instead, as far as undersigned can tell, the Government asks the Court to find the following: starting in 2014, Mr. Shumake developed a strong relationship with Mr. Knights, researched different affordable housing technologies and other projects, put together a team that eventually travelled to Ireland and then to Tanzania to meet with and convince the Tanzanian military to form a company and enter into a multi-million dollar joint venture to utilize the housing technology and complete other projects in September 2015 – a "pretty good deal" (**Tx2 at 63:24**, Knights' testimony). Mr. Shumake associates with IHRC so it can be the charitable arm of the housing project.

The housing project is moving along, but Mr. Shumake decides to try to enter the marijuana business in early 2016 out of some supposed desperation to turn a quick profit. Despite his desperation, he goes through the process of hiring a lawyer to form and publicly register a marijuana company. He goes to California to scout or to do marijuana deals, but has marijuana related money seized from him and gets arrested in June 2016, and later prosecuted. Mr. Shumake immediately changes strategy, and decides to use IHRC as a front for his marijuana aspirations to avoid scrutiny when transporting marijuana related money that he has obtained somehow from somewhere, so hires and convinces multiple lawyers to come up with a bogus process using bags and documents and the like to falsely reflect IHRC's charitable causes. *Within three weeks after the California seizure*, the lawyers employ the phony IHRC scheme, but it does not work and they have marijuana related money seized in late June, and again in August of 2016.

In 2017, despite that Mr. Shumake is supposedly getting desperate to make

quick money and *to hide his marijuana dealings*, he hires yet another lawyer to split his marijuana business and publicly register yet another legal marijuana company in California, and then, finds a large flower farm, secures the purchase of the farm and recruits a team to gather and contribute millions of dollars to join his publicly registered marijuana company and convert the flower farm to a marijuana farm, which farm is months away from growing any marijuana.

Apparently, only then does Mr. Shumake realize the folly of his get-rich-quick-from-legal-marijuana scheme, somehow raises more money for marijuana out of state, which he decides to fly into Los Angeles, but for some other marijuana related project, apparently in Northern California. So he hires Flint and tells him to tweak the bogus IHRC documents and to try to avoid TSA screening by referencing the yet to be ratified Vienna convention, and adding specific mention that there are IHRC projects in the United States and some of the money is for purchasing land in the marijuana capital of the United States, "Northern California."

The Government's tale is far-fetched on its face, and it begs some obvious questions that lack logical, plausible answers.

Why, if Mr. Shumake was able to generate hundreds of thousands of dollars from or for marijuana without partners in 2016 and desperate to make a *quick* buck, did he bother with the long, expensive, and public process of buying a legal marijuana farm that was obviously months away from growing any marijuana in 2017?

If Mr. Shumake was hell bent on concealing his marijuana dealings after getting busted in 2016, why in 2017 did he hire an attorney to make more public filings reflecting that he was engaged in the marijuana industry? In other words, if his intention was to be involved in illegal interstate marijuana trafficking, why announce to the world you are involved in the marijuana business at all if you were

simultaneously trying to disguise your marijuana money as something unrelated to marijuana, i.e. as IHRC humanitarian money?

Why would Mr. Shumake in his IHRC phony cover story include that he wanted to use IHRC funds to buy land in Northern California, the marijuana capital of the United States, particularly when was living hundreds of miles away? In other words, why would you reveal your true nefarious intention in a letter with a fake cover story?

Why would Mr. Shumake want the money transported to LAX if it was for real estate in Northern California?

In any event, what evidence suggests that in 2017, Mr. Shumake was part of any other marijuana endeavor other than Louis Armstrong and Associates, LLC's 3500 Via Real in Santa Barbara?

What evidence suggests that Mr. Shumake was in Northern California in 2017?

The simple answer to all of these is in the negative, there is no evidence for the prerequisites to the Government's tale, and Mr. Shumake would not do any of these patently dumb things. Instead, the only plausible way to understand what happened with Flint in July of 2017 is that he was a confused, bumbling mess who thought he was smarter than he actually was.

Flint decided on his own to try to avoid TSA screening. He did his own research to determine that the Vienna Convention gave him "diplomatic immunity" from TSA screening in the United States. He added his own strange, nonsensical errors to the IHRC cover letter template. And he paid the price. His foolish choices should not be attributed to Mr. Shumake.

Regardless, Mr. Flint's bizarre behavior does not counter the abundance of corroborated and documented evidence put forth by Mr. Shumake, especially in the absence of a coherent, let alone concrete, narrative. The Government needed to not

only show that Mr. Shumake's plausible and established version of events is false, but that *its own theory* that the money was for a marijuana violation is the more likely one. Moreover, the Government had the burden to demonstrate that the Defendant donations had a substantial connection to marijuana violations; but even if *arguendo* its version of events is the more likely one, that version is a vague speculative connection to some unspecified, and unproven marijuana violations, falling far short of what is required for forfeiture of the money as intended to facilitate drug violations.

## CONCLUSION

The Court should find that, at trial, the Government did not meet its burden to prove by a preponderance of evidence that the Defendant $148,145.00 was either proceeds of or intended to facilitate any drug violations, and that the Government did not prove by a preponderance of evidence that there was substantial connection between the Defendant property and any offense, and therefore that the Defendant property is not subject to forfeiture. The Court should enter a verdict and judgment in favor of Claimant, and order the Defendant property returned to the sole Claimant, Robert Shumake.

Respectfully Submitted,

20 February 2024

/s/*Edward M. Burch*
EDWARD M. BURCH, CSBN 255470
DAVID M. MICHAEL, CSBN 74031
LAW OFFICES OF MICHAEL & BURCH
One Sansome Street, Suite 3500
San Francisco, CA 94104
Telephone:   (415) 946-8996
Facsimile:   (415) 946-8837

E-mail:    edward@michaelburchlaw.com
E-mail:    david@michaelburchlaw.com
Attorneys for Claimant
ROBERT SHUMAKE

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that, on 20 February 2024, I caused to be electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*s/Edward M. Burch*_____
EDWARD M. BURCH
Attorney for Claimant