**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>$148,145.00 IN U.S. CURRENCY,<br><br>    Defendant.<br><br>ROBERT SHUMAKE,<br><br>    Claimant. | CASE NO. CV 18-0670 PVC<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL** |

**I.**

**INTRODUCTION**

This *in rem* civil forfeiture case arises under the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), 18 U.S.C. § 983, and the Controlled Substances Act (CSA), 21 U.S.C. § 801 et seq.  Plaintiff is the United States of America (the "Government"), and Defendant is $148,145.00 in United States (U.S.) Currency (the "Currency").  (Parties' Stipulated Facts ("Stip. Facts") at ¶ 8, Dkt. No. 159-1).  The issue is whether the Government can compel civil forfeiture of the Currency from Claimant Robert Shumake, who has a

controlling interest in the money.  (*See generally* Court's Order Re: Pending Motions, Dkt. No. 115; Tr. 1 at 242-43).[1]

The parties consented to the Court's jurisdiction to enter final judgment in this civil forfeiture case on October 28 and November 3, 2022, under 28 U.S.C. § 636(c) and Fed. R. Civ. P 73(b), including the entry of final judgment.  (Dkt. Nos. 120, 121).  A bench trial was held on December 12 and 13, 2023, under Fed. R. Civ. P.  52(a)(1) (Dkt. Nos. 164, 165), and the case is now before the Court for a final verdict and judgment, under Fed. R. Civ. P. 52(a).

After reviewing all the evidence, including the testimony at trial, exhibits admitted, and all written submissions including pre-trial and post-trial briefs, the Court makes the following Findings of Fact and Conclusions of Law.  Any finding of fact that constitutes a conclusion of law is adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is adopted as a finding of fact.

---

[1] References to the Trial Transcripts are designated as "Tr. 1" and "Tr. 2" to identify the day of trial.  The transcripts from December 12 (Dkt. No. 172) are "Tr. 1" and from December 13 (Dkt. No. 173) are "Tr. 2."  Exhibits offered and admitted into evidence without objection are identified as "GEX" for Plaintiff Government and "CEX" for Claimant Shumake.  Stipulated Facts include underlying deposition transcripts and other exhibits the parties agreed to submit before trial.  Facts from the hearing transcript or exhibits that are not stipulated and represent a finding of fact are identified only by the transcript citation.

## II.

## FINDINGS OF FACT

### A.   Seizure of Defendant Currency

1.      On July 25, 2017, Daniel Flint presented himself to Chicago's Midway International Airport TSA for passenger screening intending to fly through Minneapolis-St. Paul Airport en route to LAX.  (Stip. Facts at ¶ 1).

2.      While Flint was en route from Chicago to LAX, the FBI and TSA devised a plan to conduct a "reverse screening" on Flint when he arrived at LAX.  (*Id.* at ¶ 2-3; Tr. 1 at 27:6-17, 27:18-25).  The plan directed TSA officials in Minneapolis to allow Flint to travel without submitting baggage to TSA screening.  (Stip. Facts at ¶ 1).

3.      When Flint arrived at LAX, TSA initiated reverse screening while FBI agents and other federal law enforcement officers interviewed him.  (*Id.* at ¶ 4; Tr. 1 at 27:3-5, 29:1-21, 94:18-25).  Agents observed that Flint was nervous during the interview and refused to answer multiple questions based on a purported attorney-client privilege.  (Tr. 1 at 90:4-6).

4.      Flint told agents that he was a lawyer for Shumake, traveling that day on behalf of Shumake to transfer the contents of a bag embroidered with the words "Diplomatic Pouch."  (Tr. 1 at 47:1-9).

5.      Agents asked to search Flint's bags, including the Pouch.  (Stip. Facts at ¶ 5).  The Pouch was zippered and locked with a plastic card window and a card inserted stating "International Human Rights Commission (IHRC) Diplomatic Pouch."  (GEX 1 at 3-5; Tr. 1 at 30:22-25, 31:9-20).

3

6.     Flint refused to consent to the search.  (GEX 1 at 3-5; Tr. 1 at 30:7-25, 31:1-17, 48:1-15).

7.     Instead, Flint told interviewing agents that the Pouch was not subject to security screening because he was a diplomatic courier for the IHRC.  Flint explained that Shumake appointed him and administered an oath granting him diplomatic status.  (Tr. 1 at 46:13-18, 47:10-15, 75:15-25).

8.     Flint also told law enforcement that he was not authorized to go into the Pouch without clearance from Shumake, and only Shumake could provide consent.  (Stip. Facts at ¶¶ 5-7; Tr. 1 at 48:4-10, 48:22-49:1; *see also* Tr. 1 at 76-77, 84, 95:19-24 (Flint was working for Shumake that day as Shumake's attorney, disclaimed ownership of the money, and claimed attorney-client privilege regarding the money)).

9.     Flint, with law enforcement still present and listening, called Shumake over a speakerphone.  (Stip. Facts at ¶ 7; Tr. 1 at 49:19-25, 50:1-25, 51:1-19).

10.     After agents advised that they did not accept the diplomatic status of Flint or the Pouch, Shumake gave the agents consent to search the contents of the Pouch.  (Tr. 2 at 49-50; Stip. Facts at ¶ 7).[2]

11.     Agents then searched and seized the contents of the Pouch that contained $148,145.00 in U.S. currency.  (Stip. Facts at ¶¶ 8-9; Tr. 1 at 52:12-16, 53:7-12, 78:3-7).

---

[2] At trial, however, Wesley Williams, a Supervisory Federal Air Marshal detailed to TSA Security Operations testified that when initially called, Shumake denied consent, but when called a second time, Shumake provided consent to search the Pouch.  (*Compare* Stip. Facts at ¶ 7, *with* Tr. 1 at 50-51).  The Court notes the inconsistency, but it does not affect the outcome.

12.     The Currency consisted primarily of small domination bills (mostly $20 bills) (GEX 1 at 15; Tr. 1 at 81:15-23), contained in plastic shopping bags, and packaged in vacuum-sealed or shrink-wrapped plastic (GEX 1 at 8-12; Tr. 1 at 52:15-16, 80:12-22). The Currency did not have any bank bandings or markings and had not been withdrawn recently from a bank or other financial institution.  (GEX 1 at 17; Tr. 1 at 79:6-23, 80:23-25; 82:7-10).

13.     Flint was not a diplomat recognized by the United States Department of State.  (GEX 10; Tr. 1 at 105:4-6).  But to prove his claim of diplomatic status, Flint directed agents to several documents in his possession.  (Tr. 1 at 38:7-15, 46:1-12, 48:8-18).

14.     Flint was carrying a purported diplomatic identification card, but he did not have a diplomatic passport.  (GEX 5(b); Tr. 1 at 42:14-20, 45:6-19).

15.     Flint also carried a letter dated July 20, 2017, which bore Shumake's signature, titled "Diplomatic Transportation and Direction Letter" (Direction Letter).  (GEX 7; Tr. 1 at 34:10-25, 35:1-3).

16.     The Direction Letter stated that "[a] portion of these deposits shall be utilized as a down payment on real estate transactions in northern California."  (GEX 7; Tr. 2 at 131:13-24)  The Direction Letter also stated:

> Pursuant to Articles 27.3 through 27.6 of the Vienna Convention on
> Diplomatic Relations (VCDR), you shall not be detained or abated in any
> way and the contents of your bag may not be seized or forfeited.  As
> Designated Courier Agent of this Office, you shall be allowed to freely

1   carryout your assignment on behalf of the International Human Rights

2   Commission.

3

4   [And a]lthough your assignment shall not be impeded in any way, please be

5   courteous with all TSA officials and/or law enforcement without violating

6   the confidentiality of your assignment.  As you are aware, this is a

7   confidential matter, and our projects and contacts are of a proprietary nature.

8   Your assignment may not be disclosed or disseminated to anyone without

9   the expressed written consent of this office.

10

11   (GEX 7; Tr. 1 at 37:15-25, 69:2-5).

12

13   17.   Based on his attempts to avoid detection by TSA on July 25, 2017, Flint was

14   convicted of 49 U.S.C. § 46314(a), (b)(2) for "Entering an Airport Area in Violation of

15   Security Screening Requirements" and for moving the Currency through airport security

16   while avoiding security screening.  (GEX 12-13; Tr. 1 at 109:9-10, 110:2-11).

17

18   **B.   Shumake's Couriers & Prior Seizures**

19

20   18.   Beginning in or about May 2015, Shumake was appointed "Head of

21   Mission" to the United States for the IHRC.  (CEX 62; Tr. 1 at 61:20-25, 236:23-25).

22

23   19.   Flint, Darrin Coleman, and Douglas Hampton were lawyers who worked as

24   agents for, and at the direction of Shumake ("Shumake's Couriers").  (Tr. 1 at 236:20-25,

25   237:1-8 (Flint & Hampton), 238:7-25 (Flint & Hampton), 241:7-14 (Coleman)).

26   Shumake's Couriers acted as couriers to carry currency through airports, purportedly for

27   IHRC purposes, to deliver to Shumake at his direction.  (Tr. 1 at 47:1-8 (Flint), 100:9-24

28   (Coleman), 101:5-13 (Hampton); Tr. 2 at 107:23-25, 108:1-5, 109:5-9).

6

20.     Shumake paid his couriers a fee of "a few thousand dollars."  (GEX 18(a) at 80:5-81:15; Tr. 2 at 104:8-19).

21.     Shumake's Couriers carried both IHRC and personal funds, which were at times comingled.  (Tr. 2 at 108:8-18, 109:5-15, 110:3-6).

22.     Before June 2017, two of Shumake's Couriers (Coleman and Hampton) had funds seized by law enforcement (the "Prior Seizures").  (Tr. 2 at 112:8-25).

23.     In total, law enforcement seized approximately $410,000 from Shumake's Couriers in 2016.  (Tr. 2 at 112:8-25, 113:9-16).

24.     As of June 2017, no funds from either of the Prior Seizures had been returned.  (Tr. 2 at 112:8-25).

25.     One of Shumake's Couriers in the Prior Seizures was carrying a direction letter like the Direction Letter that Flint was carrying (the "Coleman Letter").  (GEX 18(a) at Ex. 1; Tr. 1 at 100:9-23).

26.     The Coleman Letter is like the Direction Letter but did not reference the Vienna Convention or state that the courier "shall not be detained or abated."  (*Compare* GEX 18(a) at Ex. 1, *with* GEX 7 at 1).

27.     Shumake provided the Coleman Letter to Coleman, as his "diplomatic courier."  (GEX 18(a) at 76:20-77:16 & Ex. 1).

28.     The Direction Letter and the Coleman Letter bear the same signature.  (*Compare* GEX 7 at 2, *with* GEX 18(a) at Ex. 1).

**C.**   **The Tanzania Project-IHRC Connection to California's Marijuana Business**

29.   Shumake Global Partners, a company controlled by Shumake, entered a joint venture with an arm of Tanzania's military in or about 2015 (the "Tanzania Project").  (CEX 81-82; Tr. 1 at 226:17-25).

30.   Shumake testified that he was responsible for procuring "materials" for the Tanzania Project (Tr. 2 at 62:13-25, 71:9-20) and that the Currency consisted of donations solicited for use in the Tanzania Project (Tr. 1 at 239:12-25, 242:2-14, 247:12-22).

31.   While projects in Africa often required cash, Shumake's role in the Tanzania Project was to source materials from Ireland, and both the supplier in Ireland and the governmental counterparty in Tanzania could accept wires or other non-cash payments.  (Tr. 2 at 71:3-72:24).

32.   The Tanzania Project did not "kickoff" as planned and was "mothballed" by no later than March 2017.  (Tr. 2 at 64:11-25, 73:3-15).

33.   Based on the delay in the Tanzania Project, Shumake directed Andy Knights, an engineer, to leave Tanzania and travel to California to work on a marijuana cultivation project.  (Tr. 2 at 64:11-25; 73:11-25).

34.   Shumake entered a commercial lease on behalf of the IHRC in or about June 2017.  (CEX 65; Tr. 1 at 256:4-16).

35.   Shumake testified that in 2017, he was spending half of his time in southern California, near the Los Angeles International Airport (LAX); he "was prospecting [a

8

place for a legal marijuana business] in that area" so he arranged to have an IHRC office in Los Angeles (Tr.1 at 255-57; CEX 65) from where he intended to fundraise, and from there could … take [cash funds] overseas to Africa rather than having multiple trips."  (Tr. 1 at 257:21-23).  Shumake also testified, "[o]ur office [in L.A. is] where we would procure capital in that office, then take a flight from L.A. directly to Ethiopia."  (Tr. 2 at 114:24-115:1).

### D. <u>Shumake's Marijuana Business Dealings</u>

36.     Shumake first became involved in the marijuana business in 2015 or 2016. (GEX 18(a) at 22:21-23, 50:9-14; Tr. 1 at 259:11-16; Tr. 2 at 99:1-4).

37.     Shumake knew during the relevant period (2016 and 2017) that marijuana was illegal under federal law.  (GEX 18(a) at 45:25-46:9).

38.     In 2016, Shumake hired a lawyer to "to put together the structure [for a medical marijuana collective] based upon how California was organized at the time" to create a "nonprofit mutual benefit corporation" called "Louis Armstrong & Associates" (LAA), an LLC named for "the jazz musician Louis Armstrong because he was [a marijuana smoker]."  (Tr. 1 at 259-60; CEX 74 (LAA Articles of Organization filed with Secretary of State April 18, 2016)).

39.     Shumake testified that he intended to buy undervalued properties through LAA, and then flip them for a profit once the market for marijuana collective real property "stabilized."  (Tr. 1 at 262:20-263:9).

9

E.     **Shumake's Marijuana Dealings in Northern California**

40.     In the summer of 2016, Shumake began exploring entry into the legal marijuana industry in California.  Shumake testified that Northern California was an area that was new and unknown to him, so he was "networking, meeting different people in the space to make introductions … [and going] to several locations."  (Tr. 1 at 263-264; *see also* Tr. 1 at 141).

41.     Shumake testified that he was "looking for land and trying to get an understanding of this whole cannabis industry through different strands [of marijuana]. This strand versus another variant."  (Tr. 1 at 262:6-10).

42.     On June 5, 2016, Shumake was arrested in Anderson, California, in Shasta County.  Shasta County is in Northern California.  (Tr. 1 at 130:16-25, 131:1-3, 261:21-25; 262:1-11).

43.     Law enforcement seized at least $121,730 in United States currency which was found at the scene of the arrest (the "Shasta Currency").  (Tr. 1 at 140:10-12, 145:20-25, 146:1).

44.     The Shasta Currency consisted primarily of small-denomination bills and was not bank-banded or marked.  (Tr. at 146:20-25, 147:1-3).

45.     Officer Halligan testified that Shumake told him that he was "in the process of forming a medical marijuana collective and was there to meet with potential growers and procure marijuana, as well as land for his medical marijuana collective."  (Tr. 1 at 141).

46.     Officer Halligan testified that Shumake had LAA documentation with him and told him that he was in Anderson looking for real properties to lease to others to grow marijuana.  (Tr. 1 at 261:13-262:3; *see also e.g.*, Tr 1 at 142-44 (Anderson Police Department, Officer Halligan re: Shumake statements on June 5, 2016)).

47.     During his arrest in Anderson, Shumake admitted that he had visited marijuana grow locations that day to purchase marijuana.  (Tr. 1 at 141:13-15, 142:8-13).  Shumake also stated that (a) he was attempting to start a purported "marijuana collective war" (Tr. 1 at 141:4-12); (b) his purported marijuana collective was named LAA (Tr. 1 at 151:2-7); (c) he was in Shasta County at that time to purchase marijuana and land for growing marijuana (Tr. 1 at 141:4-18, 151:20-25, 152:1-5); and (d) he believed there was "big money" that could be made through a purported marijuana collective (Tr. 1 at 142:18-24).

48.     For example, Shumake testified that he originally intended to purchase real estate in Northern California to set up his medical marijuana business (*i.e.,* he would buy a farm "for cheap" before the legal California marijuana industry expanded from medical to recreational and then sell the collectives after that expansion and increase in value).  (Tr. 1 at 262-63).  But, when Shumake's intentions were foiled by an arrest and seizure of the Shasta Currency, he turned his attention to purchasing real property in Carpinteria, California.  (GEX 18(a) at 27:16-21, 36:11-24; GEX 26).

F.     **The Via Real Property Project**

49.     In March 2017, Shumake found a piece of undervalued real property in Santa Barbara at 3500 Via Real ("Via Real property").  "The Via Real property was being used as a 10-acre tulip farm."  (Tr. 2 at 21).

50.     LAA was used to accomplish the purchase and the conversion of the Via Real property from flowers to marijuana.    (Tr. 2 at 120).

51.     In March 2017, LAA gained access to the Via Real property and gave Shumake the go-ahead to negotiate a lease purchase option.  Shumake ultimately acquired a lease option to buy the Via Real property for $5 million.  (Tr. 2 at 141).

52.     On or about March 17, 2017, LAA entered a purchase agreement for the Via Real property to grow marijuana.  (CEX 79; Tr. 2 at 23:7-10).

53.     The deal that Shumake negotiated allowed LAA to make an initial $50,000 good faith deposit, another $210,000 payment toward the lease/purchase price after the negotiation period ended, and $500,000 to secure the purchase rights for the Via Real property.  The purchase price for the Via Real property was $5,560,500 due at the close of escrow.  (CEX 79; Tr. 2 at 15:5-15, 140:21-25, 141:1-2).

54.     When federal agents seized the Currency, the LAA-joint venture partners had invested approximately $3 million in contribution capital to buy and develop the Via Real property into a medical marijuana collective ("Via Real Project").  (Tr. 2 at 13, 15, 16-18; GEX 26 at 17; Tr. 2 at 20:10-12; *see also* Tr. 2 at 76:16-19).

55.     Shumake testified that, although he "spent a couple thousand dollars" for initial "soft costs dollars" of legal fees, travel, wining and dining, paying the brokers, … to put this deal together," he was not required to, nor did he contribute any of the $3 million plus contribution capital to the Via Real Project.  (Tr. 2 at 19:6-20:1; *see also* Tr. 2 at 76 (Knights's testimony: "Q. Was it your understanding that Mr. Shumake was the sole owner of the Via Real property? A. Oh, I know that wasn't true because it was a whole bunch of them.")).

56.     Shumake testified that the Via Real Project (unlike himself) had plenty of capital on hand through the start of 2018.  (Tr. 2 at 19:6-20:12, 24:10-26:13; GEX 26 at 17 (Shumake testimony and Operating Agreement re: capital contributions); CEX 78 at 22-36).[3]

57.     Shumake added that, although he was an equity partner on paper, his LAA partnership account had a zero-dollar balance, and the 2018 tax returns for LAA showed that the Via Real Project still had millions of dollars in its capital account.  The K-1 statements reflected that Shumake had $0 in his capital account at the start of 2018 and $0 at the end of 2018, while the other LAA partners began 2018 with almost $2 million in capital still in their accounts.[4]  (Tr. 2 at 18:2-18, 25:3-26:8; CEX 78 at 5, 12-28).

58.     The Government offered evidence to show that by July 2017, Shumake was desperate for cash, if not to purchase the Via Real property specifically, then for other marijuana business (or personal tax) reasons.  (GEX 18(a) at 21:19-22:9; GEX 26; Tr. 1 at 141:4-12; Tr. 2 at 15:5-15, 140:21-141:2).

59.     The Government introduced evidence that federally regulated banks in California would not fund marijuana collective property purchases, development costs, or hold cash obtained from the sale of medical marijuana.  (Tr. 2 at 99-100; GEX 18(a) at 37:13-38:13).

---

[3] The Government also established that Shumake owed several hundred thousand dollars to the IRS in back taxes.  (GEX 18(a) at 21:19-22:9).

[4] Shumake testified that there was no need for him to contribute any capital to the Via-Real Project, and he had no access to the team's capital.  (Cl.'s Post-trial Mem. at 4-5; Tr. 2 at 24-26).  The Court accepts as true that Shumake's partnership account had no money in it and that he had not (yet) contribute[d] capital to the Via Real Project.  But the Court does not find credible his assertion that he had "no need" to contribute to the Via Real Project.

## G.     Shumake Commingled IHRC and LAA Assets and Associates

60.     Shumake's association and dealings with IHRC and LAA overlapped in several ways. Shumake admitted that he wanted to use the proceeds of future marijuana sales to fund future IHRC projects. (Tr. 2 at 138:17-39:18)

61.     Shumake also commingled the use of staff from IHRC for LAA purposes. Shumake hired Knights, his trusted engineer on the Tanzania Project, to develop infrastructure to grow marijuana on the Via Real property. (Tr. 2 at 64:16-21).

62.     Shumake directed Knights to leave the Tanzania Project and begin work on the Via Real Project in Spring 2017. (Tr. 2 at 64:16-65:5).

63.     In Spring 2017, Knights testified that he arrived to find the Via Real property in "deplorable" condition. (Tr. 2 at 65:22-66:20).

64.     Shumake oversaw the Via Real Project renovations, while living in Montecito—"15 minutes outside of Carpinteria"— about two weeks out of the month. (Tr. 2 at 23:7-24:3). Shumake testified that "[not] much … got accomplished from March and June on the Via Real property." (Tr. 2 at 76:10-15).

65.     During Knights's first work stretch from March to May 2017, a path was formed for materials that had been ordered but had not yet arrived. (Tr. 2 at 67:2-11). By Knights's second stay at the Via Real property, from May 18 or 19 to June 13, 2017, materials were still delayed, but he oversaw completion of a pad and framing for "dry out buildings." (Tr. 2 at 67:18-68:11).

14

66.     Knights testified that the Via Real Project "was not ready for operation" and was not ready to grow marijuana by the time he left in June 2017.  (Tr. 2 at 68:14-22 ("No marijuana was being grown … because it would have been a violation of the California code … [and] they had no fumigator, UV-lights, [or] translucent panels.  They … had no camera at the gate … [or] gate they could secure per the regulation …."), 69:10-17).

67.     Knights was paid for his work on the Via Real Project, but not by Shumake. Instead, Knights was paid with a combination of cash and checks, usually with a credit card for any expenses that came up as needed and requested.  (Tr. 2 at 69:21-24, 74:13-17, 75:6-9).

68.     The record does not make clear where or when the Via Real Project was completed or who paid for it.  The Government, however, established that development continued because by 2020, the Via Real Project employed approximately 30 people growing and selling medical marijuana.  (GEX 18(a) at 27:16-21, 36:11-24; GEX 26).

69.     The Currency was seized on July 25, 2017 (Stip. Facts at ¶ 1), barely over a month after Knights left the Via Real Project.

### H.     Shumake's Connection to the Currency

70.     On the day of the seizure, Shumake maintained an office in North Hollywood billed to the International Human Rights Commission (IHRC).  The office was used to "start recruiting, to do fundraisers, to start sharing the story … if we raise capital we would raise enough funds to take overseas to Africa rather than having multiple trips." (Tr. 1 at 256-58).

71.     Shumake testified that he knew during the relevant period that banks would not accept money associated with marijuana businesses, including LAA.  (GEX 18(a) at 37:13-38:13; Tr. 2 at 99:5-7, 100:2-5).

72.     In May and June 2017, Shumake met with Brian Kennedy and Kenneth Caldwell in California to persuade them to donate to the Tanzania Project.  (Tr. 2 at 30-31).  He ultimately solicited donations from them.  (Tr. 1 at 244:19-21, 247:12-14, 247:19-23 (Kennedy), 245:7-9 (Caldwell)).

73.     Shumake told Kennedy and Caldwell someone would pick up cash from them when it was available in late June/early July 2017.  (Tr. 2 at 34:1-35:10).

74.     In July 2017, Shumake directed Flint to pick up cash donations that Shumake had solicited from Kennedy and Caldwell in Chicago from one of Caldwell's restaurants ("Harold's Chicken Shack") and told Flint to travel to Los Angeles with that cash.  (Tr. 1 at 242:2-6, 249:5-250:11).  On July 25, 2017, Flint traveled from Chicago to Los Angeles, where the Currency was seized.  (Stip. Facts ¶¶ 1-9).

75.     Shumake claimed ownership and control over the Currency based on his testimony that he procured the $148,145 in cash from friends who wanted to donate or invest in the Tanzania Project.  (Stip. Facts 6-8; Tr. 1 at 47:1-9, 48:4-10, 48:22-49:1; *see also* Dkt. 103-3 at ¶ 3).

**III.**

**CONCLUSIONS OF LAW**

### A.    Jurisdiction and Venue

The Court has jurisdiction over this civil *in rem* forfeiture matter under 28 U.S.C. §§ 1345 and 1355.[5]  Venue lies in this district under 28 U.S.C. § 1395.

### B.    Statutory Elements for Civil Forfeiture *In Rem*

The CSA "provides that all money exchanged in a drug transaction and 'all proceeds traceable to such an exchange' are subject to forfeiture." *United States v. Real Prop. Located at 20832 Big Rock Drive, Malibu, Cal. 902655*, 51 F.3d 1402, 1411 (9th Cir. 1995) (quoting 21 U.S.C. § 881(a)(6)).  Case law interpreting the CSA recognizes that § 881(a)(6) provides two alternative theories for establishing a violation that leads to a civil forfeiture judgment.

In cases involving illegal drug trafficking, the proceeds theory focuses on whether the origin or source of the property seized—here, the Currency—is substantially connected to illegal drug activity generally.  The facilitation theory, on the other hand, is focused on whether there is evidence that connects the purpose of the property seized and an act manifesting an intent to engage in illegal drug activity.  The statutory language uses the word "facilitate" to require evidence that the property seized would have made it easier to engage in the intended future illegal drug activity.  *See United States v. $11,500.00 in U.S. Currency*, 869 F.3d 1062, 1075 (9th Cir. 2017).  "On its face, however,

---

[5] Civil forfeiture claims are brought in federal court as *in rem* proceedings because the Court must focus on the guilt of the property seized, not the guilt or innocence of the owner-claimant.  *See United States v. $36,000.00 in U.S. Currency*, No. CV 16-6043 PA (FFMx), 2018 WL 839865, at *7 (C.D. Cal. Feb. 8, 2018).

17

§ 881(a)(6) contains no limiting principle and appears to apply whenever anyone, at any point in time, so much as *thinks* about using money to purchase drugs." *Id.* at 1070. But "§ 881(a)(6) does not authorize forfeiture based on mere intent to facilitate drug transactions without proof of some act to effectuate that intent." *Id.* at 1075.

"[U]nrealized intentions or … [future] inchoate plans," therefore, are too speculative to satisfy the § 881(a)(6) standard. *Id.* at 1071; *see id.* at 1072 ("Bad thoughts alone cannot constitute a crime; there must be an act, or an omission to act where there is a legal duty to act.") (quoting 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 11.4 (2d ed. Supp. 2016)); *see also* Model Penal Code § 2.01 cmt. (Am. Law Inst. 1985) ("It is fundamental that a civilized society does not punish for thoughts alone."). Consequently, in CAFRA, Congress delineated the government's burden of proof for facilitation to require proof of a nexus or "substantial connection" between the property seized and the illegal act. 18 U.S.C. § 983(c)(3) ("[I]f the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense."). *See also $11,500.00 in U.S. Currency*, 869 F.3d at 1075 ("We need not define at this juncture just how substantial a step the actor must take before her money could be forfeited under § 881(a)(6). We hold only that § 881(a)(6) does not authorize forfeiture based on mere intent to facilitate drug transactions without proof of some act to effectuate that intent.").

### C.    **Burden of Proof**

Under CAFRA, Congress changed the burden of proof for establishing a CSA violation and securing a judgment of civil forfeiture *in rem* from probable cause to preponderance of the evidence. Instruction 1.3 of the Ninth Circuit Manual of Model Jury

18

Instructions defines preponderance of the evidence as "more probably true than not true." Black's Law Dictionary defines the standard as evidence that is "sufficient to incline a fair and impartial mind to one side of the issue rather than the other."  Black's Law Dictionary 1201 (7th ed. 1999).

A government plaintiff, therefore, must prove by a preponderance of the evidence that the property seized is subject to forfeiture.  18 U.S.C. § 983(c)(1).  The standard of proof at trial may be met "with sufficiently strong circumstantial evidence linking the currency to drug trafficking in general," and it need not tie (or establish a substantial link) to drug transactions.  *United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006, 1013 (9th Cir. 2013).  The circumstantial evidence offered also need not be available at the time of seizure or when the complaint was filed.  CAFRA permits the government to use all evidence obtained during post-filing investigation to prove its case.  CAFRA provides that "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property."  18 U.S.C. § 983(a)(3)(D).  Instead, it is the government's burden at trial to prove a substantial connection between the property and the offense.  18 U.S.C. § 983(c); *see United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1167-68 (9th Cir. 2008).

### D.    Substantial Connection

To establish a violation of CSA using a facilitation theory, § 983(c)(3) requires the government to "establish that there is a substantial connection between the property and the criminal offense."  The substantial connection requirement is not a high bar, and this connection must merely be "more than incidental or fortuitous."  *United States v. Real Prop. in Santa Paula, Cal.*, 763 F. Supp. 2d 1175, 1184 (C.D. Cal. 2011).  Furthermore, in *$11,500.00 in U.S, Currency*, 869 F.3d at 1071, the Ninth Circuit held that where the

19

government's theory is that money was intended to be used as facilitating property, then the government must also offer evidence of some action manifesting such an intent.

The act manifesting intent to facilitate illegal drug trafficking can be reflected by circumstantial evidence that is not limited to the time of the seizure.  This evidence can exist from the time preceding the seizure and extend to well after the forfeiture complaint is filed.  *See* 18 U.S.C. § 983(c)(2) ("[T]he Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture.").

### E.      Totality of the Circumstances

"The determination whether the [plaintiff] government has met its burden of proof is based on the aggregate of the facts, including circumstantial evidence." *United States v. $49,790 in U.S. Currency*, 763 F. Supp. 2d 1160, 1167 (N.D. Cal. 2010) (citing *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 980 (9th Cir. 2002)); *see United States v. $36,000.00 in U.S. Currency*, 2018 WL 839865 (C.D. Cal., Feb. 8, 2018) (bench trial). To make this determination, courts use "common sense rather than clinical detachment." *United States v. $181,987.14 in U.S. Currency*, 2002 WL 31951270, at *3-4 (S.D. Ohio 2002); *see also United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 469 (7th Cir. 2005) ("[W]e consider the totality of the evidence as a whole and in the appropriate context.").  For example, when the government uses a proceeds theory to prove a CSA violation, it need not show that the property seized was derived from the proceeds of a specific illegal drug transaction.  Instead, the Government need only prove that the currency was more likely than not derived from the proceeds of illegal drug trafficking *in general*.  Similarly, when using a facilitation theory, the government also need not show a substantial connection between the currency seized and a particular drug transaction.  Instead, the critical evidence is that which shows an act

manifesting an intent to facilitate any controlled substance transaction.  *$11,500.00 in U.S. Currency*, 869 F.3d at 1071.

Certain kinds of circumstantial evidence are highly indicative of drug trafficking. Federal courts have found that currency bundled and placed inside vacuum-sealed plastic bags is strongly indicative that the currency is either proceeds of illegal drug transactions. *See $49,790 in U.S. Currency*, 763 F. Supp. 2d at 1167 (citing cases, *inter alia, United States v. Currency, U.S. $42,500*, 83 F.3d 977, 982 (9th Cir. 2002) (finding that wrapping currency in cellophane or plastic reflects an attempt to reduce the odor of drugs and lessen the risk of detention by trained narcotics canines)).  "Like cellophane, vacuum-sealed plastic bags are highly impermeable to gas and commonly used to stave off detection by trained dogs." *Id.* (citing *Currency, U.S. $42,500*, 283 F.3d at 983).  A large amount of cash is also strong evidence that the money was furnished or intended to be furnished in return for drugs; however, possession of a large sum of money standing alone is insufficient to establish probable cause, *id*. at 1167-68, or a preponderance of the evidence.  The method of delivery is also circumstantial evidence probative of drug trafficking proceeds.  For example, transporting currency via couriers is a preferred method for drug dealers to transfer money because they can avoid leaving a paper trail. *United States v. $242,484.00*, 389 F.3d 1149, 1161 (11th Cir. 2004).

### F.     Innocent Owner Affirmative Defense

Once the government establishes a *prima facie* case under either the proceeds or facilitation theories, the claimant *may but need not* assert an "innocent owner" affirmative defense.  *See* CAFRA, 18 U.S.C. § 983(d)(1); *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1167 (9th Cir. 2008); *see also Funds in the Amount of $239,400*, 795 F.3d 639, 646-47 (7th Cir. 2015) ("'It must be remembered, however, that in a civil forfeiture action the *government* is the plaintiff, and it is the government's right

to forfeiture that is the sole cause of action adjudicated.  [So] [i]f the government fails to meet its burden of proof ... the claimant need not produce any evidence at all.'") (quoting *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 79 (2d Cir. 2002)).

## IV.

### ANALYSIS[6]

### A.    The Currency Constitutes Proceeds of Illegal Drug Transactions.

The Court finds persuasive the proceeds theory advanced by the Government. When viewed in its totality, the circumstantial evidence that Government offered at trial makes it more likely than not that the Currency constitutes proceeds of illegal drug activity in violation of the CSA.

*First,* the Currency consists of $148,145 in cash, *see supra* ¶ 11, which is a large sum of money under any circumstances.  It is a particularly large sum of money to carry on an airplane and through airport security and exceeds the amount a reasonable person would need for a domestic flight from Chicago, through Minneapolis, to Los Angeles. Cash carried in large amounts that exceeds normal daily usage is circumstantial evidence of a link to narcotics trafficking.  *United States v. Cruz*, 669 F. App'x 883, 884 (9th Cir. 2016) (court may consider a "large amount of cash in small and varied denominations, rubber-banded together in separate bundles," as well as inconsistencies in circumstances of transit and seizure).

*Second*, the Currency consisted of small denomination (mostly $20) bills.  *See supra* ¶ 12.  Large amounts of small denomination currency are also circumstantial

---

[6] In this section, the Court cites to its Findings of Fact, *see supra* § II.

evidence of illegal drug proceeds because legitimate sources of money used in business transactions are usually withdrawn from a bank and converted into large denominations if exchanged in cash form. *See United States v. $242,484.00*, 389 F.3d 1149, 1161 (11th Cir. 2004) ("As a matter of common knowledge and common sense, legitimate businesses usually do not transport this much cash by couriers. The same is not true of drug rings, which commonly do utilize couriers to transport in cash their ill-gotten gains, which can be huge.").

*Third,* the way that the Currency was packaged makes the nexus or connection between the money and illegal drug activity more likely than not. The Currency was contained in plastic grocery bags, rubber-banded or vacuum sealed into bundles, with no bank markings or banding. *See supra* ¶ 12. Improvised containers and banding are further evidence that currency has been kept outside of the financial system and evidence of a link to trafficking. *See Cruz*, 669 F. App'x. at 883-84 (granting summary judgment for government in forfeiture action when a large amount of cash in small and varied denominations, rubber banded together in separate bundles was seized); *United States v. 22,800.00 in U.S. Currency*, No. 2:17-CV-04611-SVW-AS, 2018 WL 3738962, at *3 (C.D. Cal. July 25, 2018) (denying motion to dismiss based on amount of seized currency, inconsistent packaging, lack of proper bank markings, and positive dog sniff alert); *$242,484.00*, 389 F.3d at 1161 (rubber-banded, bundled currency containing no bank wrappers show money is drug-related); *United States v. $80,010.00 in U.S. Currency*, No. 2:08-CV-5189-FMC-SS, 2009 WL 7520021, at *7 (C.D. Cal. July 9, 2009) ("The large number of smaller denomination bills and bundling of the Defendant currency in rubber bands support a connection to drugs as well.").

The Ninth Circuit also recognizes the use of plastic to wrap money as indicia of drug-related transactions, because this is a recognized method of attempting to evade detection by canine searches. *$42,500.00*, 283 F.3d at 982; *see also United States v.*

*Approximately $28,120.00 in U.S. Currency*, No. 1:13-CV-00640-AWI, 2014 WL 7359189, at \*4-5 (E.D. Cal. Dec. 24, 2014).  "Unlike a purse or money pouch, cellophane is not a normal repository for carrying large amounts of money.  Rather cellophane, which is largely impermeable to gas, is commonly used to conceal the smell of drugs and avoid detection by drug dogs."  *$42,500.00*, 283 F.3d at 982.  Courts have also found a nexus to drugs when the currency is wrapped in fabric softener sheets and plastic wrap.  *United States v. $129,727.00 U.S. Currency*, 129 F.3d 486, 491 (9th Cir. 1997).

*Fourth*, the Direction Letter included fraudulent and farcical statements about Flint's diplomatic status and his authority to avoid TSA screening.  *See supra* ¶¶ 13-16.  Shumake did not present evidence that he had the power to confer diplomatic status by appointment or sworn oath or that his status as IHRC's Head of Mission gave him authority to confer diplomatic immunity under the Vienna Convention.  Because Shumake did not have the authority to confer diplomatic status on Flint and Flint is not recognized as a diplomat by the U.S. State Department, the Direction Letter was inadequate to confer such status on Flint or immunity from an airport search.  While Shumake disputes that he signed the Direction Letter or authorized any of his agents to sign it on his behalf (*see* Tr. 1 at 250-52; Tr. 2 at 130, 135-36), the Court does not find Shumake's testimony credible. The signature on the Direction Letter matches the signature on the Coleman Letter, which Shumake admitted that he authorized.  *See supra* ¶¶ 25-28.  That the Direction Letter expanded upon the Coleman Letter suggests that the use of the Direction Letter and diplomatic Pouch were in response to the Prior Seizures and an attempt to avoid future currency searches and seizures.  Thus, the scheme to transport the Currency under purported diplomatic immunity is consistent with an illegal origin and supports the reasonable inference that it was the proceeds of drug trafficking.

*Fifth*, Shumake's connection to the California marijuana business. *see supra* ¶¶ 36-48, provides circumstantial evidence that the Currency was the proceeds of an illegal drug

transaction.  Less than a year prior to the Currency seizure, he was attempting to purchase marijuana and land to grow marijuana, and LAA was continuing to cultivate marijuana on the Via Real Property for several years after the seizure.  *See supra* ¶¶ 40, 45-48, 68.  A record of illegal drug activity "is a highly probative factor in the forfeiture calculus." *United States v. $67,220.00 in U.S. Currency,* 957 F.2d 280, 286 (6th Cir. 1992); *see also United States v. U.S. Currency $83,310.78*, 851 F.2d 1231, 1236 (9th Cir. 1988) ("Evidence of [the claimant's] 1973 conviction for possession of a controlled substance for sale, his 1983 conviction for possession, and his arrest for possession in 1984 are circumstances demonstrating more than a mere suspicion of his involvement in illegal drug transactions."); *United States v. Carrell*, 252 F.3d 1193, 1201 (11th Cir. 2001) (finding that "[e]vidence that claimants are generally engaged in the drug business … [with] a history of drug violations" are probative of asset-drug link) (citation omitted); *United States v. Approximately $75,000 in United States Currency*, No. 16-CV-07095-EDL, 2017 WL 8314662, at *5 (N.D. Cal. July 31, 2017) (prior drug-related arrests part of probable cause analysis).

*Sixth*, the Prior Seizures is evidence that the Currency was the proceeds of drug trafficking.  In 2016, approximately $410,000 was seized from Shumake's Couriers, none of which has been returned to Shumake.  *See supra* ¶¶ 22-24.  Shumake's Couriers were all directed to pose as IHRC emissaries to carry the cash through airports using the same kind of Direction Letter signed by him to avoid detection.  *See supra* ¶¶ 19, 25.  The similar method used to avoid detection by TSA officials is "probative and gives credibility to the [G]overnment's theory concerning the [Currency]." *See United States v. $59,520.00 in U.S. Currency*, No. CV14-00284-SJO (ASX), 2015 WL 5031904, at *3 (C.D. Cal. Aug. 24, 2015) (where the government offered evidence that the claimant had a second parcel seized within months of the seizure of the defendant currency, sent in similar circumstances, the court found the similar currency seizure "probative and gives credibility to the government's theory concerning the subject parcel").  Moreover, the fact

1    that after these Prior Seizures, Shumake continued to use couriers, to whom he paid

2    thousands of dollars per trip to transport his funds, *see supra* ¶ 20, instead of switching to

3    a more economical form of transport, such as wire or bank transfers, indicates that the

4    Currency was being intentionally kept out of the financial system—facts that are

5    consistent with drug trafficking proceeds rather than a legal business.

6

7         For all these reasons, the Court finds that the Government has established by a

8    totality of the circumstantial evidence that the Currency's source came from proceeds of

9    an illegal drug exchange in violation of CSA and CAFRA.

10

11        **B.    Shumake's Alternate Explanation Is Not Credible.**

12

13        Shumake offered an alternative explanation for the source of the Currency to

14   controvert the Government's circumstantial evidence that the Currency was the proceeds

15   of drug trafficking.  He testified that in May and June 2017, he met with Brian Kennedy, a

16   music producer, and Kenneth Caldwell, a restaurateur, and successfully persuaded them to

17   donate to the Tanzania Project.  *See supra* ¶ 72.  Shumake informed Kennedy and

18   Caldwell that a courier would pick up cash from them when it was available in late June

19   or early July 2017.  *See supra* ¶ 73.  In July 2017, Shumake directed Flint to pick up cash

20   donations from one of Caldwell's restaurants in Chicago and transport the cash to Los

21   Angeles.  *See supra* ¶ 74.  On July 25, 2017, Flint traveled from Chicago to Los Angeles,

22   where the Currency was seized.  *See supra* ¶ 74.  Shumake claimed ownership and control

23   over the Currency based on his testimony that he procured the $148,145 in cash from

24   friends who wanted to donate or invest in the Tanzania Project.  *See supra* ¶ 75.

25

26        But Shumake offered no direct evidence that tied the Currency to donations

27   solicited from Kennedy or Caldwell.  Neither Kennedy nor Caldwell, nor even Flint,

28   testified at trial.  While Shumake acknowledges that there is no direct evidence that the

Currency was in fact cash donations solicited by Kennedy and Caldwell for the Tanzania Project, he argues that the Court "has more than enough competent and admissible evidence to make that quite reasonable, if not obvious, inference." (Dkt. No. 178 at 34). The Court finds otherwise.

Shumake's contention that the Currency was donations for the Tanzania Project is implausible and incredible. While Shumake asserted at trial that the Currency was solicited as donations to fund the Tanzania Project, *see supra* ¶ 30, Knights testified that this Project was "mothballed" no later than March 2017—more than four months before the purported solicitation and seizure of the Currency, *see supra* ¶ 32. In fact, the Tanzania Project was sufficiently stalled that Shumake directed Knights to instead travel to California to work on the Via Real Project. *See supra* ¶¶ 33, 62. Knights also testified that while projects in Africa often required cash, Shumake's role in the Tanzania Project was to source materials from Ireland, and both the supplier in Ireland and the governmental counterparty in Tanzania could accept wires or other non-cash payments. *See supra* ¶ 31. Courts may consider the implausibility or lack of an innocent explanation for a large amount of cash as one factor in the analysis. *See, e.g., Cruz*, 669 F. App'x at 884 (granting summary judgment where claimant's "unsupported and self-serving attempts to explain a legitimate source of the funds and a non-drug related reason to have such a substantial amount of cash in his vehicle were permissibly disregarded by the court as implausible"); *United States v. $222,200.00 in U.S. Currency*, No. SACV-12-2070-DOC, 2013 WL 12122300, at *5 (C.D. Cal. Oct. 1, 2013) (granting summary judgment where "there is no evidence of an alternative, legitimate source for such a large sum of money").

**C.     The Currency Was Intended to be Used to Facilitate the Purchase, Sale, or Cultivation of a Controlled Substance.**

The Court also finds persuasive the Government's theory of facilitation.  When viewed in its totality, the trial evidence establishes an intent to use the Currency to facilitate one or more transactions involving marijuana, a federal controlled substance.

In June 2016, after Shumake was arrested in Northern California with more than $120,000 in cash, he stated to the arresting officers that he was forming a marijuana collective (LAA) and seeking to buy marijuana or land to cultivate marijuana for LAA.  *See supra* ¶¶ 42, 43, 45-47.  While marijuana had been legalized and decriminalized in California, Shumake knew during the relevant period (2016 and 2017) that marijuana was illegal under federal law.  *See supra* ¶ 37.  Because banks would not accept money associated with marijuana businesses, even in California where marijuana had been decriminalized and legalized, Shumake had to operate his marijuana businesses, including the Via Real Project and in Shasta County, with cash.  *See supra* ¶¶ 43-48, 71.

The Shasta Currency seized in June 2016, which Shumake acknowledged was to be used to facilitate marijuana purchase, sale, or cultivation, was consistent with the Currency seized in July 2017 in rough amount, denominations, and condition, *see supra* ¶¶ 12, 44, plausibly suggesting that both were part of the same illegal scheme.  At the time of the Currency seizure, the Direction Letter carried by Flint and signed by Shumake indicated that the money was intended for "payment on real estate transactions in northern California," *see supra* ¶ 16, where Shasta County is located, *see supra* ¶ 42.  Furthermore, by March 2017, Shumake had only secured $3.2 million of the $5.6 million needed to close escrow on the Via Real Property.[7]  *See supra* ¶¶ 53-54.  Thus, by July 2017,

---

[7] At the time of the Currency seizure, Shumake had yet to make any investment in his LAA capital account, unlike his partners who had almost $2 million in their capital

Shumake was desperate for cash, if not to purchase the Via Real property specifically, then for other marijuana business (or personal tax) reasons. *See supra* ¶ 59.

The implausibility of Shumake's alternate explanation for the Currency, *see supra* § IV.B, is further evidence that the Currency was intended to facilitate the purchase or cultivation of marijuana. In *Cruz*, the substantial connection between the cash and the drug activity was found to be, in part, based on Cruz's "unsupported and self-serving attempts to explain a legitimate source of the funds and a non-drug related reason to have such a substantial amount of cash." 669 F. App'x at 884; *see also United States v. Real Prop. Located at 3846 Nisenan Lane*, No. CIV. 06-1383 WBS DAD, 2009 WL 2777178, at *3 (E.D. Cal. Aug. 28, 2009) (finding a substantial connection where property was used for a marijuana grow operation for at least three months, involving 465 marijuana plants). For all these reasons, the Court finds that the Government established by a preponderance of the evidence that a substantial connection existed between the Currency and Shumake's intent to purchase, sell, or cultivate marijuana, a controlled substance under federal law.

Finally, the act manifesting an intent to facilitate is easily satisfied here by the Currency being given to Flint in Chicago and flown across the country to Los Angeles under the guise of the diplomatic Pouch accompanied by the Direction Letter, stating that the Currency was intended to be used for land purchases in Northern California. *See supra* ¶¶ 1,4, 5, 11, 15, 16. Thus, unlike the facts of *$11,500.00*, this is not a case of intent untethered to any action. *See* 869 F.3d at 1075 ("We hold only that § 881(a)(6) does not authorize forfeiture based on mere intent to facilitate drug transactions without proof of some act to effectuate that intent.").

---

accounts. *See supra* ¶¶ 54-57. He also owed several hundred thousand dollars to the IRS in back taxes. *See supra* ¶ 56 n.3.

# V.

# VERDICT

For all these reasons, the Court concludes that Plaintiff has proven by a preponderance of the evidence that Defendant $148,145,000.00 in United States Currency constitutes property traceable to one or more violations of 21 U.S.C. § 841 *et seq*. and 18 U.S.C. § 981(a)(1)(C).  The evidence admitted at trial establishes by a preponderance that the Currency constitutes proceeds traceable to money exchanged in a drug transaction. The trial evidence also establishes by a preponderance that regardless of the origin of the Currency, it was intended to be used in whole or part to facilitate the purchase, sale, or cultivation of marijuana, a controlled substance illegal under federal law.  Therefore, all rights, title, and interest in the $148,145.00 in U.S. Currency are hereby ordered forfeited to the United States of America, under § 881(a)(6).  The Court will issue a judgment under Fed. R. Civ. P. 58, consistent with these Findings of Fact and Conclusions of Law.

DATED:  June 13, 2024

_____
PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE

30